417 F.2d 972
 Marshall P. SAFIR, Arnold Weissberger and Sapphire Steamship Lines, Inc., Plaintiffs-Appellants,
v.
Andrew GIBSON, Successor to and Substituted for James W. Gulick, Acting Maritime Administrator, Maritime Administration, United States Department of Commerce, James S. Dawson, Jr., Secretary, Maritime Subsidiary Board, Maritime Administration, United States Department of Commerce, and Maurice Stans, Successor to and Substituted for C. R. Smith, Secretary of Commerce of the United States, Appellees.
 Nos. 571-573.
 Dockets 33389-33391.
 United States Court of Appeals Second Circuit.
 Argued June 2, 1969.
 Decided September 26, 1969.
 
 COPYRIGHT MATERIAL OMITTED Isadore B. Hurwitz, New York City, for plaintiffs-appellants.
 Daniel Joseph (William D. Ruckelshaus, Asst. Atty. Gen., Vincent T. McCarthy, U. S. Atty., Alan S. Rosenthal, Atty., Dept. of Justice, Washington, D. C.), for appellees.
 Before WATERMAN, FRIENDLY and KAUFMAN, Circuit Judges.
 FRIENDLY, Circuit Judge:
 
 
 1
 The plaintiffs in this action are Sapphire Steamship Lines, Inc., and two of its officers and stockholders. In March, 1965, Sapphire began operations as an unsubsidized common carrier by water, undercutting the rates of various carriers which were members of a conference known as the Atlantic and Gulf American Flag Berth Operators (AGAFBO). Shortly thereafter, on March 29, 1965, AGAFBO drastically reduced its rates to an admittedly unfair, unreasonable and noncompensatory level. As a result of this reduction, Sapphire was deprived of cargo which was indispensable to its profitable operation. Some eleven months later, on March 1, 1966, AGAFBO raised its rates to their former levels. Sapphire went out of business in March of the following year and was adjudged a bankrupt that May.
 
 
 2
 On December 12, 1967, the Federal Maritime Commission issued a report, Docket No. 65-13, on the result of an investigation "of virtually the entire spectrum of the U.S. military cargoes," in which AGAFBO was a respondent. The Commission concluded that "the drastic reductions [in AGAFBO's rates] were designed for but one purpose, the elimination of Sapphire from the carriage of military cargo" by unfair competition, and thus were "so unreasonably low as to be detrimental to the commerce of the United States and contrary to the public interest as well." The Commission found that by willfully setting its rates at this level AGAFBO violated § 15 of the Shipping Act, 1916, as amended, 46 U.S.C. § 814.[1]
 
 
 3
 Counsel for Sapphire promptly wrote the Acting Maritime Administrator and the Maritime Subsidy Board requesting that subsidy payments to members of AGAFBO be terminated and that action be instituted to recover subsidies paid since March 29, 1965, the date AGAFBO reduced its rates.[2] The request was based on § 810 of the Merchant Marine Act, 1936, 46 U.S.C. § 1227, which provides:
 
 
 4
 It shall be unlawful for any contractor receiving an operating-differential subsidy under sections 1171-1182 of this title or for any charterer of vessels under sections 1191-1204 of this title to continue as a party to or to conform to any agreement with another carrier or carriers by water, or to engage in any practice in concert with another carrier or carriers by water, which is unjustly discriminatory or unfair to any other citizen of the United States who operates a common carrier by water exclusively employing vessels registered under the laws of the United States on any established trade route from and to a United States port or ports.
 
 
 5
 No payment or subsidy of any kind shall be paid directly or indirectly out of funds of the United States or any agency of the United States to any contractor or charterer who shall violate this section. Any person who shall be injured in his business or property by reason of anything forbidden by this section may sue therefor in any district court of the United States in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of the suit, including a reasonable attorney's fee.
 
 
 6
 The Secretary of the Subsidy Board answered that the Board would "take whatever action it deems appropriate in keeping with the provisions of the Merchant Marine Act of 1936, as amended." Similar letters written after expiration of the time to appeal from the FMC's decision received a similar noncommittal reply. In fact, the Maritime Administration has taken no action whatever.
 
 
 7
 Plaintiffs thereupon instituted this suit in the District Court for the Eastern District of New York against the Acting Maritime Administrator, the Secretary of the Subsidy Board, and the Secretary of Commerce. The complaint alleged substantially the foregoing facts and sought a declaration that § 810 barred subsidy payments to the AGAFBO lines and an order compelling defendants to stop such payments and to take appropriate legal action to recover subsidies paid since March 29, 1965. Federal jurisdiction was sufficiently predicated on 28 U.S.C. § 1337, which gives the district courts jurisdiction over any actions arising under any Act of Congress regulating commerce, cf., Empresa Hondurena de Vapores, S.A. v. McLeod, 300 F.2d 222, 226-27 (2 Cir. 1962), vacated on other grounds sub nom. McCulloch v. Sociedad Nacional de Marineros de Honduras, 372 U.S. 10, 83 S.Ct. 671, 9 L.Ed.2d 547 (1963), and 28 U.S.C. § 1361, which gives the district courts jurisdiction over "any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."[3] On defendants' motion the complaint was dismissed for failure to state a claim on which relief could be granted.[4] The plaintiffs have appealed.
 
 
 8
 Two major issues are presented: Whether plaintiffs have standing to sue, and if so, to what extent the acts complained of are unreviewable because they are committed to agency discretion. Neither question can be answered without a close examination of the statute to determine what interests it was designed to protect and how it was designed to protect them. It is unfortunate — though not surprising — that § 810 does not deal expressly with a situation where the Maritime Administrator refuses to take steps concerning subsidy payments to violators; since it does not, we must analyze the statutory scheme as a whole and the legislative history of the Act to arrive at a judgment of what Congress would have wanted done if this problem had occurred to it.
 
 
 9
 At the outset we must reject the suggestion of the district court that because the statute is difficult to interpret, its interpretation is a matter entirely within the agency's discretion. As Professor Jaffe has said, "Discretion * * * is not self-defining; it does not arise parthenogenetically from `broad' phrases. Its contour is determined by the courts, which must define its scope and its limit." Jaffe, Judicial Control of Administrative Action 572 (1965). We deal here with an issue requiring reconciliation of two conflicting statutory purposes — the general policy of the Act to build up the American merchant marine through subsidy payments and the direction of § 810 for withdrawal of those subsidies when they are used to hurt rather than help. "The question in each case of consistency with statutory purpose is addressed to the judge." Id. at 575.
 
 
 10
 The Merchant Marine Act, 1936, §§ 501-610, 49 Stat. 1995, provided a new method of subsidizing American-flag shipping, primarily by construction-differential and operating-differential subsidies. In the course of debate, Senator O'Mahoney of Wyoming and Senator Clark of Missouri brought up the case of a subsidized American-flag line which by a conference agreement with foreign lines was "crushing out of existence an American line which enjoys no subsidy." The victim had assured the committee that "without any subsidy, if removed from the incubus of this conference and of the subsidy which is granted to the American subsidized line, * * * [it] could compete with all the lines of the world." 80 Cong.Rec. 9921 (1936). Senator O'Mahoney asked Senator Copeland of New York, who was in charge of the bill:
 
 
 11
 Would it not be a simple matter to provide by amendment that no subsidy of any kind or character shall be paid to any shipping line or shipping concern which has entered into an arrangement to destroy any other American line? Id. 9922.
 
 
 12
 Senator Copeland undertook to "consult the experts and see if they can choose language to cover what the Senator has in mind." Id. The next day Senator O'Mahoney offered as an amendment what became § 810. After referring to the evil "of paying a subsidy to an American line which was in truth and fact engaged in a conspiracy with foreign lines to discriminate against another American line," he stated, more broadly, that the amendment would "make it clear to the [United States Maritime] Commission that it is the intention of Congress not to pay subsidies of any kind to any American line which is willing to enter into any combination with other lines, including those operating under foreign flags, to crush American competition."[5] He added:
 
 
 13
 In order to give an opportunity to those who may be injured by illegal combinations of the kind I have described to protect themselves I have incorporated in this amendment the principle of section 4 of the Clayton Act which permits the victim of such unfair practices to sue for treble damages.
 
 
 14
 Senator Copeland made no objection and the amendment was adopted. 80 Cong. Rec. 10075-76 (1936).
 
 
 15
 The legislative history demonstrates that termination of subsidies was not designed to be a purely penal measure, although quite likely the punitive effect was considered a desirable byproduct. The primary concern manifested was with the added burden which subsidies impose on the competitive position of the victim. We think this concern also extends to the interest of a former victim in the recovery of subsidies improperly paid in the past to lines which are still his competitors, although here the duty of the Administrator may be less absolute than is the obligation to cease payments to current violators. In the nature of things, few complaints of violations will be received and acted on until after some further payments have already been made. Recovery of such payments poses an added cost on the violators and thus will partially make up to the victim for the burden which the earlier payments indirectly imposed on him.[6] Although the statute does not expressly authorize the Maritime Administrator to recover subsidies improperly paid in the past, common law principles would permit this under the subsidy contract in the absence of a statutory prohibition, and we find no such prohibition here. On the other hand, we do not believe that § 810 protects the interest of a carrier in having former violators barred from ever receiving subsidy payments despite their return to the paths of virtue. In fact, we do not think § 810 even authorizes the Administrator to take such a step. So far as concerns payments, as distinguished from recoveries, the statute is mandatory where applicable, contrast §§ 606(1), 806(c), 46 U.S.C. § 1176(1), 1228, and perpetual debarment would be an exceedingly harsh result, which might fatally interfere with the general policy of the Act to foster the development of the American merchant marine.
 
 
 16
 Construing the statute as we do, we think Sapphire has standing to question the Administrator's failure to seek recovery of the subsidies paid during the period of violation. Since we find that § 810 was designed to promote the competitive interest of a victim by authorizing the recovery of subsidies improperly paid in the past, it follows that this interest is legally protected, see Hardin v. Kentucky Utilities Co., 390 U. S. 1, 5-7, 88 S.Ct. 651, 19 L.Ed.2d 787 (1968), and that disregard of it is a "legal wrong" within the meaning of § 10(a) of the Administrative Procedure Act, 5 U.S.C. § 702. While Sapphire is not presently competing with the AGAFBO lines, we deem that irrelevant in the circumstances of this case. Sapphire was forced out of business by the violation of § 810, and plaintiff Safir stated in an affidavit that he desired to return to the shipping business as soon as possible. Without deciding whether a potential competitor or a former victim who has washed his hands of the business would have an interest protected by § 810, we hold that an interruption of operations like that here does not sufficiently alter the victim's interest to take it out of the protection of § 810 with regard to raising the issue of the Administrator's refusal to seek recovery of past payments.[7]
 
 
 17
 The Government contends that even if plaintiffs have standing, the Administrator's failure to act is a matter within his sole discretion and therefore neither reviewable under § 10 of the APA, 5 U.S.C. § 701(a) (2), nor the proper subject of an order in the nature of mandamus, cf. 28 U.S.C. § 1361.[8] The arguments come to the same thing and we reject them both. While the Maritime Administrator may have some discretion in connection with the recovery of past subsidies as distinguished from payments to current violators, the discretion is not unlimited. Cf. American Mail Line, Ltd. v. Gulick, 133 U.S. App.D.C. 382, 411 F.2d 696 (1969): Moore-McCormack Lines, Inc. v. United States, 413 F.2d 568 (Ct.Cl. July 16, 1969). Specifically, he may not refuse to proceed against the AGAFBO lines without at least considering the interest of the victim, about which Congress was so concerned. There may be other limits on his discretion, but we need not decide this now. If plaintiffs' allegations are true, the Maritime Administration was at least required to make a considered decision whether to recover the subsidies paid in the past. An answer will reveal whether it has done this and, if so, whether on grounds consistent with the statute. For the present we ask only that the Maritime Administration give clear indication that it has properly exercised the discretion with which Congress has endowed it. Phelps Dodge Corp. v. NLRB, 313 U.S. 177, 197, 61 S. Ct. 845, 85 L.Ed. 1271 (1941).
 
 
 18
 The order dismissing the complaint for failure to state a claim on which relief can be granted is reversed and the cause is remanded for further proceedings consistent with this opinion.
 
 
 
 Notes:
 
 
 [1]
 The commission elaborated on its findings as follows:
 AGAFBO's rates were detrimental to commerce because they were designated to and did have a disastrous effect on Sapphire. AGAFBO's rates were contrary to the public interest because they were predatory in nature and in derogation of an important aspect of the public interest, the policy to foster competition to the extent compatible with the regulatory purposes of the Act. (Footnote omitted.)
 Town of the four Commissioners who participated in the report would also have found that the members of AFAFBO engaged in a conspiracy to drive Sapphire out of the trade.
 
 
 [2]
 The functions now performed by the Federal Maritime Commission and by the Maritime Administration and its Subsidy Board were originally vested in the United States Maritime Commission. By Reorganization Plan No. 21 of 1950, 64 Stat. 1273, and Reorganization Plan No. 7 of 1961, 75 Stat. 840, the regulatory functions of the United States Maritime Commission were transferred to the Federal Maritime Commission, an independent agency, and the functions relating to the award, amendment, and termination of subsidy contracts were transferred to the Maritime Administration, an agency within the Department of Commerce
 
 
 [3]
 We thus need not consider the mooted question whether § 10 of the APA, 5 U.S.C. §§ 701-704, constitutes an independent basis for federal jurisdiction. See Byse & Fiocca, Section 1361 of the Mandamus and Venue Act of 1962 and "Nonstatutory" Judicial Review of Federal Administrative Action, 81 Harv.L. Rev. 308, 326-31 (1967)
 
 
 [4]
 The defendants also moved to dismiss the complaint for improper venue and for failure to join indispensable parties, or, in the alternative, for a transfer to the District of Columbia under 28 U.S.C. § 1404(a). The court below found it unnecessary to pass on these points in view of its holding that the complaint failed to state a cause of action
 While the parties have not discussed in this court whether the AGAFBO lines were required to be joined as defendants, we are concerned that disposition of the action in their absence "may * * * as a practical matter impair or impede" their ability to protect their interests in the subject matter of this litigation. F.R. Civ.P. 19. Accordingly, if the district court should require their joinder or if they should intervene, we would not wish the district court to feel that anything said in this opinion precludes its considering any new arguments which the AGAFBO lines may bring to its attention.
 
 
 [5]
 Apart from the language of § 810 itself, this statement answers defendants' contention that the statute is inapplicable here because AGAFBO was composed solely of American lines
 
 
 [6]
 The district court thought that withdrawal of the subsidies was unrelated to the competitive interest of the injured line since other innocent lines could at once be admitted to the routes and subsidized. Apart from the question whether any such lines are waiting in the wings, Congress felt that subsidy payments to violators did affect the competitive position of the victim and we see no reason why we should or could reject that conclusion
 
 
 [7]
 28 U.S.C. § 1361 speaks of "a duty to the plaintiff" rather than of a "legal wrong." The quoted language, proposed by the Department of Justice, was accepted by the sponsors of the legislation as incorporating the law on the availability of mandamus. We think that under a rational law of mandamus such an order is available to anyone entitled to review under § 10(a) of the APA and seeking affirmative official action. See generally Byse & Fiocca,supra note 3, 81 Harv. L.Rev. at 316, 320.
 
 
 [8]
 The Government also argues that the district court was correct in finding that the provision of a private treble damage remedy created a strong implication that the statute authorized no further relief to a citizen. We disagree. The grant to private citizens of a remedy that would not exist in the absence of specific authorization in no way precludes the availability of further relief consistent with the statutory scheme. Even if the victim is successful in a treble damage suit against the violators, his recovery does not correct the evil at which § 810 was aimed, namely, that public moneys have been used to assist some citizens to hurt others in a manner inimical to the interest of the United States