Marshall P. SAFIR, Arnold Weissberger and Sapphire Steamship Lines, Inc., Plaintiffs-Appellants,

v.

Andrew GIBSON, Successor to and Substituted for James W. Gulick, Acting Maritime Administrator, Maritime Administration, United States Department of Commerce, James S. Dawson, Jr., Secretary, Maritime Subsidiary Board, Maritime Administration, United States Department of Commerce, and Maurice Stans, Successor to and Substituted for C. R. Smith, Secretary of Commerce of the United States, Appellees.

American Export Isbrandtsen Lines, Inc., Bloomfield Steamship Co., Lykes Bros. Steamship Company, Inc., Moore-McCormack Lines, Inc., United States Lines, Inc., American President Lines, Ltd., Prudential Steamship Co., Inc. and Prudential Grace Lines, Inc., and Farrell Lines, Inc., Intervenors.

No. 552, Docket 34355.

United States Court of Appeals, Second Circuit.

Argued Feb. 13, 1970.

Decided Feb. 26, 1970.

Rehearings Denied June 18, 1970.

Certiorari Denied Oct. 12, 1970. See 91 S.Ct. 57.

Certiorari Denied Dec. 7, 1970. See 91 S.Ct. 241.

Isadore B. Hurwitz, New York City, for plaintiffs-appellants.

Gilbert S. Fleischer, Atty., Admiralty & Shipping Section, Department of Justice, Washington, D. C. (William D. Ruckelshaus, Asst. Atty. Gen., Washington, D. C., Edward R. Neaher, U. S. Atty., Eastern District of New York, Brooklyn, N. Y., and Louis E. Greco, Attorney in Charge, New York Office, Admiralty and Shipping Section, Department of Justice, of counsel), for appellees.

Stuart J. Land, Irvin B. Nathan, Arnold & Porter, J. Franklin Fort, Kominers, Fort, Schlefer, Farmer & Boyer, Washington, D. C., Elmer A. Maddy, Kirlin, Campbell & Keating, New York City, Kurrus & Jacobi, and Galland, Kharasch, Calkins & Brown, Daniel H. Margolis, Lionel Kestenbaum, Mary-Margaret Gil-

len, Bergson, Borkland, Margolis & Adler, Washington, D. C. and Whitman Knapp, Barrett, Knapp, Smith & Schapiro, New York City, Verne W. Vance, Jr., Foley, Hoag & Eliot, Boston, Mass., and Dills & Shelker, and Gerald A. Novack, New York City, for defendants-intervenors.

Before LUMBARD, Chief Judge, and FRIENDLY and FEINBERG, Circuit Judges.

FRIENDLY, Circuit Judge:

This appeal is a sequel to our decision in Safir v. Gibson, 417 F.2d 972 (1969), where we held that under § 810 of the Merchant Marine Act, 1936, 46 U.S.C. § 1227, the Maritime Administration was "required to make a considered decision whether to recover the subsidies paid in the past" to members of AGAFBO who had been found by the Federal Maritime Commission (FMC) to have violated § 15 of the Shipping Act, 1916, as amended, 46 U.S.C. § 814. Rates on U.S. Government Cargoes, Docket No. 65–13, 11 F.M.C. 263 (1967). After our decision was handed down, the Maritime Subsidy Board of the Maritime Administration initiated a proceeding, Docket No. S–243, on October 24, 1969, directing its chief hearing examiner to conduct an investigation and compile a public record "which will provide a basis for recommending to the Maritime Subsidy Board whether Section 810, Merchant Marine Act, 1936, as amended (46 U.S.C. § 1227), has been violated and the appropriate action that should be taken." Steamship lines that were members of AGAFBO and received operating-differential subsidies during the period of the violations and the plaintiffs here were named as parties. Dissatisfied with this procedure, plaintiffs moved the District Court for the Eastern District of New York to issue an injunction restraining the defendants "from making any further payments of operating or construction differential subsidies to the members of AGAFBO which have violated Sec. 810 of the Merchant Marine Act,

1936" and to grant other appropriate relief. Judge Dooling denied the motion in all respects.

■ Insofar as the district court refused to enjoin current subsidy payments, its action was clearly consistent with our opinion, indeed compelled by it. We said we did not believe that § 810 protected "the interest of a carrier in having former violators barred from ever receiving subsidy payments despite their return to the path of virtue," and sharply distinguished making current payments to former violators from refusing to seek recovery of payments during the violation, 417 F.2d at 977. Plaintiffs do not charge that the AGAFBO members now receiving subsidy payments are violating § 810 or indeed that they have done so since March 1, 1966. The argument that these carriers will not have returned "to the path of virtue" until they have refunded all subsidy payments received during the period of violation is a far-fetched misreading of our decision.

On the other hand, while the district court was literally correct in its conclusion that we "did not find that Section 810 had been violated, or that a finding of a violation of Section 15 is a finding of a violation of Section 810 * * *," the primary reason why we did not do the latter was that the question was not raised. We called attention to the failure of the AGAFBO lines to seek intervention and rather pointedly invited them to do so, 417 F.2d at 976 n. 4. Their decision to remain on the sidelines should not prevent us from making a decision that will spare the plaintiffs the necessity of going through a costly and time-consuming redetermination of matters that have already been heard and decided by the agency having authority in the premises.

Section 810 of the Merchant Marine Act, 1936, makes it unlawful

for any contractor receiving an operating-differential subsidy under sections 1171–1182 of this title or for

any charterer of vessels under sections 1191–1204 of this title to continue as a party to or to conform to any agreement with another carrier or carriers by water, or to engage in any practice in concert with another carrier or carriers by water, which is unjustly discriminatory or unfair to any other citizen of the United States who operates a common carrier by water exclusively employing vessels registered under the laws of the United States on any established trade route from and to a United States port or ports.

Section 15 of the Shipping Act directs the Commission to disapprove any agreement "that it finds to be unjustly discriminatory or unfair as between carriers, shippers, exporters, importers, or ports * * * or to operate to the detriment of the commerce of the United States, or to be in violation of this chapter * * *." Section 18(b) (5), 46 U.S.C. § 817(b) (5), added in 1961, 75 Stat. 764, directs the Commission to disapprove "any rate or charge filed by a common carrier by water in the foreign commerce of the United States or conference of carriers which, after hearing, it finds to be so unreasonably high or low as to be detrimental to the commerce of the United States." A finding by the FMC that the rates of the AGAFBO members were unjustly discriminatory or unfair as between carriers would thus determine the same conduct as would constitute a violation of § 810, subject only to proof that the AGAFBO lines were receiving operating-differential subsidies at the time and that the carrier adversely affected was a "citizen of the United States who operates a common carrier by water exclusively employing vessels registered under the laws of the United States on any established route from and to a United States port or ports."

When we turn to the discussion by the FMC in Docket No. 65–13, Rates on U.S. Government Cargoes, 11 F.M.C. 263, 279, 283 (1967), we find the following:

We consider now the AGAFBO reduced rates which became effective March 29, 1965. As previously seen, MSTS was informed by AGAFBO that the reductions were temporary and for competitive purposes only, and that they were not believed to be fair, reasonable, or compensatory. There can be little doubt that the drastic reductions were designed for but one purpose: namely, the elimination of Sapphire from the carriage of military cargo. Since the rate reductions were admittedly unreasonable and noncompensatory and were justified only in furtherance of the unfair attempt to drive Sapphire from the trade, we agree with the examiner and, under the circumstances, conclude that the reduced rates were so unreasonably low as to be detrimental to the commerce of the United States, and, therefore, contrary to section 18(b) (5) of the Act.

Thus, we will consider whether the rate reductions offended the provisions of section 15. AGAFBO itself characterized its reduced rates as unreasonably low. The operating data submitted by AGAFBO show that this admission was accurate. The reduced rates were simply an attempt to deprive Sapphire of some of the cargo which Sapphire expected would be generated by its rates. And AGAFBO, by means of its reduced rates, did in fact deprive Sapphire of the nucleus cargo which was indispensable to Sapphire's profitable operation. Under these circumstances, we find that the AGAFBO agreement, through its rate-making functions, operated in a manner which was knowingly at odds with the requirements of section 18(b) (5) and which was detrimental to the commerce of the United States and contrary to the public interest as well. AGAFBO's rates were detrimental to commerce because they were designed to and did have a disastrous

effect on Sapphire. AGAFBO's rates were contrary to the public interest because they were predatory in nature and in derogation of an important aspect of the public interest, the policy to foster competition to the extent compatible with the regulatory purposes of the Act. Isbrandtsen Co., Inc. v. United States, 93 U.S.App.D.C. 293, 211 F.2d 51 (1954) cert. denied, Japan Atlantic and Gulf Conference v. United States, 347 U.S. 990, 74 S.Ct. 852, 98 L.Ed. 1124 (1954). We therefore, conclude that the AGAFBO agreement operated in a manner which was in violation of section 15.

The Commission's "Ultimate Conclusions" included, 11 F.M.C. at 287: [1]

2. AGAFBO's rates, which were reduced to an admittedly noncompensatory and unreasonable level in an attempt unfairly to compete with Sapphire were so unreasonably low as to be detrimental to the commerce of the United States contrary to the provisions of section 18(b) (5).

3. AGAFBO, by reducing its rates to an admittedly noncompensatory and unreasonable level in an attempt unfairly to compete with Sapphire, violated section 15 by knowingly setting rates which were contrary to section 18(b) (5) and which were detrimental to commerce and contrary to the public interest.

4. AGAFBO did not otherwise violate the Shipping Act.

 The only basis we can perceive for arguing that the FMC's findings did not determine that AGAFBO's rates were "unjustly discriminatory or unfair" to Sapphire is that, rather than make an explicit finding to that effect, it chose to place decision on the ground that AGAFBO violated section 15 by knowingly and willfully setting rates which "were so unreasonably low as to be detrimental to the commerce of the United States, and, therefore, contrary to section 18(b) (5) of the Act." But to rest anything on that would be hypertechnical. The reason why the rates were found to be "so unreasonably low as to be detrimental to the commerce of the United States" was because the reductions "were admittedly unreasonable and noncompensatory and were justified only in furtherance of the unfair attempt to drive Sapphire from the trade." 11 F.M.C. at 279. The FMC's refusal to find that the AGAFBO lines "conspired to drive Sapphire from the trade in violation of section 15," 11 F.M.C. at 282, and its fourth conclusion, "AGAFBO did not otherwise violate the Shipping Act," do not justify a contrary result. Section 810 is violated not only when an agreement by a subsidized carrier is unjustly discriminatory or unfair to another American-flag carrier but when such carriers "engage in any practice in concert with another carrier or carriers by water" having that effect. While "practice" covers matters other than rates, see California v. United States, 320 U.S. 577, 64 S.Ct. 352, 88 L. Ed. 322 (1944), the framers of § 810 surely thought that the fixing of unjustly discriminatory or unfair rates aimed at an American-flag carrier pursuant to a conference agreement would constitute a "practice." See Empire State Highway Transp. Ass'n v. F.M.B., 110 U.S. App.D.C. 208, 291 F.2d 336, 339, cert. denied, 368 U.S. 931, 82 S.Ct. 360, 7 L. Ed.2d 194 (1961); compare F.M.C. v. New York Terminal Conference, 373 F. 2d 424, 427 (2 Cir.1967).

 Since the AGAFBO lines and Sapphire were parties to the FMC proceeding. and the FMC was there the authorized representative of the United States as the Maritime Administrator is in the case now pending, see Sunshine

---

1. Two of the four members who participated would have gone further and have held that AGAFBO's anticompetitive activities against Sapphire went beyond the scope of the conference agreement and violated § 15 on that ground, 11 F.M.C. at 288–90.

Anthracite Coal Co. v. Adkins, 310 U.S. 381, 60 S.Ct. 907, 84 L.Ed. 1263 (1940), any "privity" that may be required for giving the FMC's determination the effect of collateral estoppel in the Maritime Administration proceeding exists. The Supreme Court has recently observed that "language to the effect that *res judicata* principles do not apply to administrative proceedings * * * is certainly too broad" and that "when an administrative agency is acting in a judicial capacity and resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, the courts have not hesitated to apply *res judicata* to enforce repose." United States v. Utah Construction & Mining Co., 384 U.S. 394, 421–422, 86 S.Ct. 1545, 1560, 16 L.Ed.2d 642 (1966). While the issues here may not have been purely factual, they were fully litigated before the agency designated to determine them. Cf. Tampa Phosphate R.R. v. Seaboard Coast Line R.R., 418 F.2d 387, 396 (5 Cir.1969). The Restatement of Judgments, § 70, says that even determinations of questions of law are conclusive between the parties on a different cause of action unless injustice would result. The only possible injustice we can perceive from giving the FMC's determinations the effect of collateral estoppel in the Maritime Administration case arises from the fact that, in view of the relatively slight sanctions imposed in Docket No. 65–13, 11 F.M.C. at 288, namely, required modifications in the conference agreement, the AGAFBO carriers had no sufficient incentive to seek judicial review. However, the Commission's finding that AGAFBO violated section 15 of the Shipping Act subjected the member lines to a potential liability of $337,000 each under that section, and supplied ample motive for them to seek judicial review even if they did not anticipate the possible use of the FMC's conclusions in a subsequent Maritime Administration proceeding.

It is the FMC, not the Maritime Administration, that has the expertise to pass on whether rates are unfair or un-

duly discriminatory, cf. Far East Conference v. United States, 342 U.S. 570, 72 S.Ct. 492, 96 L.Ed. 576 (1952), and it would be quite unseemly for the Maritime Administration to conclude that its sister agency had been wrong on a fully litigated issue the decision of which Congress had confided to it, see 2 Davis, Administrative Law Treatise § 18.12 at 626 (1958). Any objection on the ground that two different statutes are involved, see *id.* § 18.04 at 576–80, is more than overcome in this case by the point that when Congress enacted § 810, the administration of subsidies was entrusted to the same agency, the United States Maritime Commission, that was to enforce the Shipping Act. See 46 U. S.C. § 1111, Historical Note, and our earlier opinion, 417 F.2d at 975 n. 2. The 1936 Congress would hardly have expected that after the USMC had found that rates were unjustly discriminatory and unfair while wearing its Shipping Act hat, it would reexamine that conclusion on assuming its hat under the Merchant Marine Act, 1936. The separation of functions in 1950, whereby authority on rate matters passed to what is now the Federal Maritime Commission, should not alter the result.

We recognize there is a general rule against judicial interference with administrative proceedings prior to the issuance of a final order, see Myers v. Bethlehem Shipbuilding Corp., 303 U. S. 41, 58 S.Ct. 459, 82 L.Ed. 638 (1938); ABC Air Freight Co. v. CAB, 419 F.2d 154 (2 Cir.1969). Nevertheless we believe two features of this case make it appropriate for us to direct conformity with our views on the preclusive effect of the FMC decision here and now. First, the reason for applying *res judicata* to administrative agencies is not only to "enforce repose" but also to protect a successful party from being vexed with needlessly duplicitous proceedings. 2 Davis, Administrative Law Treatise § 18.12 (1958). If the latter interest is not protected at the outset of the second proceeding, it will be lost irreparably. Cf. Lummus Co. v. Commonwealth Oil

Refining Co., 297 F.2d 80, 86–87 (2 Cir. 1961), cert. denied, Dawson v. Lummus Co., 368 U.S. 986, 82 S.Ct. 601, 7 L.Ed.2d 524 (1962). In this respect, a claim of *res judicata* differs from a claim that an administrative agency has no jurisdiction over the subject matter of the investigation, as in Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41, 58 S.Ct. 459, 82 L.Ed. 638 (1938); Macauley v. Waterman Steamship Corp., 327 U.S. 540, 66 S.Ct. 712, 90 L.Ed. 839 (1946); and FPC v. Arkansas Power & Light Co., 330 U.S. 802, 67 S.Ct. 963, 91 L.Ed. 1261 (1947), an issue which Congress meant to be decided in the first instance by the agency itself.

SEC v. Otis & Co., 338 U.S. 843, 70 S.Ct. 89, 94 L.Ed. 516, rev'g 85 U.S. App.D.C. 122, 176 F.2d 34 (1949), is not to the contrary. There the SEC, in the course of an investigation, had sought enforcement of a subpoena compelling an attorney to testify to conversations with a client, alleging that the evidence theretofore compiled amounted to a *prima facie* showing that the client had consulted the attorney for a fraudulent purpose. The district judge found the evidence insufficient and denied enforcement. Subsequently the Commission announced its intention to determine whether the client's securities firms should be suspended or expelled from membership in the National Association of Securities Dealers because of its participation in the alleged fraud. The firm and the client, alleging that the Commission had no new evidence of fraud, sought a declaratory judgment that the prior determination was *res judicata* on the existence *vel non* of substantial evidence of fraud, and an injunction against the inquiry. The district court dismissed the complaint, the court of appeals reversed, and the Supreme Court reversed on the petition for certiorari in a brief *per curiam* citing the *Myers, Macauley,* and *Arkansas Power & Light Co.* cases, *supra.*

■ This case is clearly distinguishable. In *Otis,* all parties appeared to agree, and we think correctly, that the SEC would not have been precluded by the prior determination if it had been able to come up with new evidence of fraud. Under the court of appeals holding, in order to avoid an injunction against the second proceeding, the SEC had to produce new evidence of fraud, the very matter which the proceeding was designed to discover. It would turn the administrative process on its head if, before the agency could make a determination, it had to convince a court that this would be supported by substantial evidence. Here, by contrast, the quantum of evidence to support or refute the FMC's determination is not relevant. The only issues are what that agency in fact determined and whether that determination is binding on the Maritime Administrator. The conclusions we have reached clearly follow from the face of the record and the relevant principles of statutory and administrative law.

■ There is a second feature justifying judicial intervention at this stage. While the proceeding before the Maritime Subsidy Board is not being held pursuant to a court order, such an order surely would have issued under 28 U.S. C. § 1361 if the agency had not, by a timely compliance, made it unnecessary. If such an order had issued, the court would have had discretionary power to modify or clarify it if such action appeared necessary because the agency misunderstood the nature of the proceeding required. Its power is no less because the agency willingly, if to some extent mistakenly, attempted to comply with the thrust of our prior decision before being ordered to do so.

We emphasize that the court's power to clarify the nature of the proceeding which the agency must undertake does not mean that exercise of that power is necessary, or even appropriate, in every dispute that may arise over the manner in which the proceeding is being conducted. In most situations, the reasons for the normal exhaustion requirement will prevail over anything to be gained by immediate intervention. Here, however, there is nothing to be gained and

much to be lost by waiting for the agency to finish its deliberation without receiving proper instructions.

We therefore direct the district court to instruct the Maritime Administration not to redetermine the issue whether the AGAFBO carriers' concerted action in reducing their rates to an unreasonably low level and holding them there for eleven months was unjustly discriminatory or unfair to Sapphire.[2] With this modification, the order denying an injunction is affirmed. No costs.

On Petitions of Intervenors
for Rehearing

PER CURIAM:

In our decision of February 26, 1970, at 137, we directed the district court "to instruct the Maritime Administration not to redetermine the issue whether the AGAFBO carriers' concerted action in reducing their rates to an unreasonably low level and holding them there for eleven months was unjustly discriminatory or unfair to Sapphire." Shortly thereafter, the AGAFBO lines, which, although fully aware of this action, had been sedulously abstaining from participation, see 417 F.2d 972, 976 n. 4 (1969); at 140, sought leave to intervene for the purpose of seeking a rehearing on that portion of our decision. We granted such leave, received petitions and accompanying briefs, and then called upon counsel for the appellants and appellees to respond.[1]

The argument most strongly pressed by the intervenors is that they had no sufficient incentive and, indeed, no opportunity to appeal the adverse findings of the FMC, see at 143. The latter branch of the argument hangs mainly on the fact that the rates found by the FMC to give rise to a violation of § 15 of the Shipping Act had expired and therefore could no longer be disapproved under § 18(b) (5). But § 15 subjects offending lines to a penalty of $1000 per day of violation. Since the FMC's determination would be conclusive in a civil action for penalties, it was therefore clearly appealable. See Pacific Far East Line, Inc. v. FMC, 133 U.S.App.D.C. 269, 410 F.2d 257 (1969). In view of the sharp tone of the FMC report and the even sharper one of the separate opinion of two members, the intervenors could hardly have taken lightly the threat of the Government's suing for a penalty; indeed, we are informed that five of them have recently settled their liability by paying $25,000 each. Moreover, while we relied mainly on this point, at 143, we did not at all mean to suggest that the AGAFBO lines should not have been aware of the possible effect of the FMC determination in a proceeding under § 810 of the Merchant Marine Act, of whose potentiality they were apprised very shortly after the FMC decision.

The Government makes the point that if appellants wished to have the Maritime Subsidy Board give conclusive effect to the FMC decision, the Board has a procedure enabling them to raise this matter *in limine*. They could have moved for a summary disposition of the issue by the Hearing Examiner, 46 C.F.R. 201.91, could have requested permission from him to appeal an adverse decision to the full Maritime Adminis-

---

2. Nothing we have said should be read as preventing the Maritime Administration from investigating the nature and extent of the individual carriers' participation in the illegal action, should it find these matters relevant to its ultimate decision on whether to seek recovery of subsidies paid during the violation and, if so, how much and from whom.

1. We requested counsel for the appellees to obtain the views of the Federal Mari-

time Commission. The latter, taking no position with respect to other issues, has advised "that its sole concern here, in the context of its responsibilities under the Shipping Act, is to insure that the finality of its determinations is preserved and that its factual findings will not be litigated long after the statutorily prescribed time for judicial review has run and in proceedings to which it is a stranger." This was the precise objective of our decision.

tration, 46 C.F.R. 201.93, and if that were granted and the appeal proved unsuccessful, could have sought further review by the Secretary of Commerce, 46 C.F.R. 202.1. Be all this as it may, we were faced with a statement by the district judge implying that the FMC determination did *not* have binding effect, at 140, and, after two and a half years, we see no point in launching appellants on the wearisome course the Government has plotted when we are clear that the legal issue must be decided in their favor. The short of the matter is that nothing advanced by the intervenors or the Government alters our conclusion that "it would be quite unseemly for the Maritime Administration to conclude that its sister agency had been wrong in a fully litigated issue the decision of which Congress had confided to it." at 143.

Two minor points should be mentioned. Four intervenors, American President Lines, Ltd., Prudential Steamship Co., Inc., Prudential-Grace Lines, Inc. and Farrell Lines, Inc., urge that they were not competing with Sapphire, had no interest in the rates which the FMC condemned and never voted on these. We see no reason for the concern felt by these carriers. We directed only that the issue whether the reduction of the rates was unjustly discriminatory or unfair to Sapphire was not to be relitigated before the Maritime Administration; we said nothing about who was responsible for these and, by a footnote 2, emphasized that "Nothing we have said should be read as preventing the Maritime Administration from investigating the nature and extent of the individual carriers' participation in the illegal action * * *" On the other side, the Government is fearful lest "the tenor of the opinion and the rationale underlying it would appear to foreclose the Maritime Subsidy Board from investigating and concluding, contrary to a majority of the FMC, that a wider conspiracy existed." But there was no "majority" finding on the issue of a wider conspiracy, since the four participating members divided two to two. The issue therefore remains open.

The intervenors' petitions for rehearing are denied.