792 F.2d 19
 Marshall P. SAFIR, Plaintiff-Appellant,
v.
UNITED STATES LINES INC., Lykes Bros. Steamship Co., Inc.,
Moore McCormack Lines, Inc., American President Lines, Ltd.,
Farrell Lines, Inc., American Export Lines, Inc., Prudential
Lines, Inc., Prudential-Grace Lines, Inc., Defendants-Appellees.
 Nos. 246, 790, Dockets 85-7481, 85-7815.
 United States Court of Appeals,
Second Circuit.
 Argued Jan. 29, 1986.
Decided May 27, 1986.
 
 Marshall P. Safir, pro se.
 Verne W. Vance, Jr., Boston, Mass. (Foley, Hoag & Eliot, Boston, Mass., of counsel) for defendant-appellee Farrell Lines, Inc.
 William Schurtman, New York City (Gregory F. Hauser, Walter, Conston & Schurtman, P.C., New York City, of counsel), for defendant-appellee American Export Lines, Inc.
 T.S.L. Perlman, Washington, D.C. (William H. Fort, Kominers, Fort, Schlefer & Boyer, Washington, D.C., of counsel), for defendant-appellee Lykes Bros. Steamship Co., Inc.
 Robert T. Basseches, Washington, D.C. (William R. Hanlon, Shea & Gardner, Washington, D.C., of counsel), for defendant-appellee American President Lines, Ltd.
 John N. McConnell, Jr., Washington, D.C. (Haight, Gardner, Poor & Havens, Washington, D.C., of counsel), for defendant-appellee U.S. Lines, Inc.
 Before NEWMAN, KEARSE and MINER, Circuit Judges.
 MINER, Circuit Judge:
 
 
 1
 This lawsuit marks yet another episode in Marshall Safir's quest to obtain additional relief for the wrongs committed in 1965 and 1966 against his now bankrupt shipping company. During that period, defendants and others engaged in predatory pricing practices for the sole purpose of forcing Safir's company, Sapphire Shipping Lines, Inc. ("Sapphire"), out of business. The instant suit is the eleventh federal court action that Safir or his defunct company has filed against the defendants relating to those pricing practices. Unlike two of Safir's earlier lawsuits, however, the current one lacks merit entirely.
 
 I. BACKGROUND
 
 2
 In early 1965, Sapphire began operations as an unsubsidized common carrier by water. Sapphire undercut the rates of various competitor carriers that were members of a shipping conference known as the Atlantic and Gulf American Flag Berth Operators ("AGAFBO"). The members of AGAFBO, by agreement, drastically reduced their rates to an admittedly unfair, unreasonable, and non-compensatory level. The sole purpose of these reductions was to drive Sapphire out of business. On March 1, 1966, AGAFBO raised its rates to their former levels. Sapphire, having already experienced irreversible setbacks, went out of business the following March and was adjudged a bankrupt that May.
 
 
 3
 In December of 1967, the Federal Maritime Commission issued a report finding that AGAFBO, by engaging in these pricing practices, had violated section 15 of the Shipping Act of 1916, 46 U.S.C. Sec. 814 (1982). At about this time, Safir commenced upon the litigious journey that brings him to our court today. First, in 1966, Sapphire instituted a "corporate treble damage suit" against the instant defendants and others, which ultimately was settled by the bankruptcy trustee with all defendants for approximately $2.5 million.
 
 
 4
 Safir also requested the Acting Maritime Administrator and the Maritime Subsidy Board to terminate subsidy payments to members of AGAFBO and to institute action to recover subsidies paid during the period of illegal practices. The request was based on section 810 of the Merchant Marine Act of 1936, 46 U.S.C. Sec. 1227 (1982). Eventually, Safir commenced suit in the Eastern District of New York seeking a declaration that section 810 barred subsidy payments and an order compelling the government to stop such payments and to take appropriate legal action to recover subsidies paid during the period of violation.
 
 
 5
 In our first encounter with the litigation stemming from the above-described events, we reversed the district court's dismissal of Safir's suit and held that his complaint stated a claim under section 810, that he had standing to prosecute that claim, and that the Maritime Administration could not decline to recapture past subsidies that were legally recoverable without making a considered decision to adopt that course. Safir v. Gibson, 417 F.2d 972 (2d Cir.1969), cert. denied, 400 U.S. 850, 91 S.Ct. 57, 27 L.Ed.2d 88 (1970) ("Safir I ").
 
 
 6
 Ultimately, the Secretary of Commerce directed recovery of approximately $1 million in subsidies paid to the four AGAFBO lines that had competed directly with Sapphire. The Secretary also affirmed the Maritime Administration's finding that the three AGAFBO lines that had not served the same routes as Sapphire had engaged in a "technical violation" of section 810, but nevertheless should not be required to repay subsidies that they had received during the period of violation. Safir appealed the Secretary's order to the United States District Court for the District of Columbia, arguing that the Secretary should recover all subsidies paid during the period of violation (more than $225 million). Safir's appeal was dismissed on the ground that he lacked standing, since it had become clear that he was not likely ever again to be in competition with the carriers that had engaged in the wrongful practices. Safir v. Dole, 718 F.2d 475 (D.C.Cir.1983), cert. denied, 467 U.S. 1206, 104 S.Ct. 2389, 81 L.Ed.2d 347 (1984).
 
 
 7
 Had the above claims represented the totality of Safir's legal battle against these defendants, this case would be unexceptional. Over the years, however, Safir has multiplied the number of legal proceedings aimed at redressing the injuries suffered by Sapphire. Many of these proceedings sought to enjoin various business transactions of defendants on the ground that such transactions would deplete defendants' assets and thereby deprive Safir of the recovery he ultimately might receive against them. Safir's legal strategy at times has been novel and occasionally successful, but by and large it has been meritless, duplicative, and burdensome to the defendants and the courts.
 
 
 8
 Safir commenced the instant action against United States Lines, Inc., Lykes Bros. Steamship Co., Inc., Moore McCormack Lines, Inc., American President Lines, Ltd., Farrell Lines, Inc., American Export Lines, Inc., Prudential Lines, Inc., and Prudential Grace Lines, Inc., alleging an implied private right of action under section 810 of the Merchant Marine Act of 1936, 46 U.S.C. Sec. 1227 (1982), to pursue a "restitutionary remedy in the form of disgorgement of the illegal earnings" that defendants had received as subsidy payments in 1965 and 1966. Safir also sought a preliminary injunction preventing Farrell from taking any action to sell the S.S. Austral Lightning, or in the alternative, requiring Farrell to set aside the proceeds of the sale pending a decision on the merits.
 
 
 9
 The United States District Court for the Eastern District of New York (Nickerson, J.) denied Safir's motion for a preliminary injunction on the grounds that Safir had not established either "a likelihood of success on the merits" or "a sufficiently serious ground for litigation and a balance of hardships tipping decidedly in [his] favor." The district court subsequently dismissed Safir's complaint on the ground that section 810 does not afford private citizens a private right of action for "restitution" of subsidies paid by the government, Safir v. United States Lines, Inc., 616 F.Supp. 613, 615-17 (E.D.N.Y.1985), and it denied his post-judgment motion for leave to amend his complaint to state a claim under section 810, in his individual capacity, for treble damages. Finally, the district court permanently enjoined Safir from (1) proceeding further in the instant action except to seek appellate review or a writ of certiorari, or to submit papers responding to applications by defendants and (2) asserting in any federal court any new claims related to, or arising out of, the events of 1965 and 1966. We fully agree with the district court's denial of Safir's preliminary injunction motion and its dismissal of Safir's complaint. We also agree with the district court that an injunction restricting Safir's future federal litigation was warranted; however, we believe the injunction, as it presently stands, is more restrictive than the circumstances require. Accordingly, we affirm the judgment of the district court but modify the injunction to provide only that no new federal action, motion, petition, or proceeding arising out of, or relating to, the events of 1965 and 1966 may be brought by Safir without first obtaining leave of court.
 
 II. DISCUSSION
 
 10
 A. Private Right of Action Under Section 810
 
 
 11
 Safir's claim for restitution of subsidies paid to defendants rests entirely on the contention that the remedy he seeks is available by way of a private action under section 810. It is no longer open to question that defendants' pricing practices in 1965 and 1966 violated the statute. Safir v. Gibson, 432 F.2d 137 (2d Cir.), cert. denied 400 U.S. 942, 91 S.Ct. 241, 27 L.Ed.2d 246 (1970) ("Safir II"). The second paragraph of section 810 provides appropriate remedies for such violations. First, it allows a public remedy, viz., that "[n]o payment or subsidy of any kind shall be paid directly or indirectly out of funds of the United States ... to any contractor or charterer who shall violate this section." We previously have interpreted this statutory language to authorize the government to recover subsidies or payments made during a period of violation. Safir I, 417 F.2d at 977. More pertinent to our consideration, however, is the private remedy provided by section 810. The statute specifically provides that "[a]ny person who shall be injured in his business or property by reason of anything forbidden by this section may sue therefor ... and shall recover threefold the damages by him sustained...."
 
 
 12
 Since section 810 does not specifically afford Safir the additional private remedy he is pursuing here, the dispositive question on this appeal is whether such a private remedy is implicit in the statutory scheme. Where a statute expressly provides for particular remedies, as section 810 does, courts are disinclined to read others into it. Transamerica Mortgage Advisors, Inc. (TAMA) v. Lewis, 444 U.S. 11, 19-20, 100 S.Ct. 242, 246-47, 62 L.Ed.2d 146 (1979); see generally Cort v. Ash, 422 U.S. 66, 78, 95 S.Ct. 2080, 2087, 45 L.Ed.2d 26 (1975) (setting forth four factors considered pertinent in determining whether a private remedy is implicit in a statute not expressly providing one). In the absence of strong indications of congressional intent to permit unexpressed remedies, we are compelled to conclude "that Congress provided precisely the remedies it considered appropriate." Middlesex County Sewerage Authority v. National Sea Clammers Association, 453 U.S. 1, 15, 101 S.Ct. 2615, 2623, 69 L.Ed.2d 435 (1981).
 
 
 13
 The history of the Merchant Marine Act, and of section 810 in particular, provides no support for Safir's argument that private litigants are entitled to relief beyond treble damages for actual injury. The Act established a program to subsidize American-Flag Carriers, its stated purpose being "to foster the development and encourage the maintenance of" a merchant marine sufficient to carry the United States water-borne commerce at all times and capable of serving as a naval and military auxiliary in times of war or national emergency. See 46 U.S.C. Sec. 1101 (1982); American Export Isbrandtsen Lines, Inc. v. United States, 499 F.2d 552, 558 (Ct.Cl.1974). Subsidies were provided in order to enable American-Flag carriers to compete successfully with foreign carriers. At the same time, those subsidies never were intended to give some American shippers a competitive advantage over other American shippers. Thus, section 810 provided comprehensive remedies for potential abuses of the subsidy system. The public remedy, by cutting off subsidy payments and allowing the government the option of recovering subsidies paid during a period of violation, effectively prevents a carrier from reaping benefits while violating the statute. The public remedy also permits the United States government to apply the recovered subsidies in a manner consistent with the purposes of the Act. At the same time, the private remedy explicitly provided for in the Act sufficiently redresses any injury that a private party might suffer.
 
 
 14
 In passing the Act, Congress focused specifically on the matter of remedies for victims of unfair practices. Senator O'Mahoney, after discussing the case of a subsidized American carrier that took part in putting an unsubsidized American carrier out of business, introduced an amendment, enacted as section 810, to make clear Congress' intent not to pay subsidies to lines that acted to crush American competition. He said:
 
 
 15
 In order to give an opportunity to those who may be injured by illegal combinations of the kind I have described to protect themselves I have incorporated in this amendment the principle of section 4 of the Clayton Act which permits the victim of such unfair practices to sue for treble damages.
 
 
 16
 80 Cong.Rec. 10076 (1936) (quoted in Safir I, 417 F.2d at 977). We find this evidence persuasive support for our conclusion that had Congress intended to allow private litigants to recover past subsidies, it would have said so.
 
 
 17
 In so holding, we do not ignore our earlier decision, in which we held that section 810's public remedy implicitly includes a governmental right to recover past subsidies. Safir I, 417 F.2d at 977. Our interpretation of the public remedy, which we believed necessary to effectuate the statutory scheme, does not support the view that there should be an expansion of the private remedy. Allowing a private litigant to recover subsidies paid to carriers that engage in violations of section 810 is neither necessary to the statutory scheme nor likely to further the purposes of the Act.
 
 
 18
 When faced with congressional silence, ambiguous language or conflicting statements, we sometimes have found it necessary to engage in a searching analysis of a statute in order to ascertain the true intent of Congress. Here, we are faced with clear statutory language, supportive legislative history and a comprehensive statutory scheme. Accordingly, we reject Safir's claim to recover the subsidies paid to defendants. In light of this conclusion, we need not address Safir's appeal of the denial of a preliminary injunction.
 
 
 19
 B. Restrictions Imposed On Future Litigation
 
 
 20
 Judge Nickerson permanently enjoined Safir from:
 
 
 21
 (1) proceeding further in this action except to (a) seek appellate review by the Court of Appeals, (b) apply for certiorari to the Supreme Court, and (c) submit papers responding to applications, if any, by defendants and (2) instituting in any federal court, including bankruptcy courts, any new action, motion, petition or proceeding arising from or related to defendants' pricing practices in 1965 and 1966 or their then receipt of merchant marine subsidies.
 
 
 22
 On appeal, Safir contends that the injunction was improper because he is not abusing the judicial system, but only attempting in good faith to vindicate his rights through the legal process. We cannot agree.
 
 
 23
 That the district court possessed the authority to enjoin Safir from further vexatious litigation is beyond peradventure. 28 U.S.C. Sec. 1651(a); Abdullah v. Gatto, 773 F.2d 487, 488 (2d Cir.1985) (per curiam); In re Martin-Trigona, 737 F.2d 1254, 1262 (2d Cir.1984); In re Hartford Textile Corp., 681 F.2d 895, 897 (2d Cir.1982) (per curiam), cert. denied, 459 U.S. 1206, 103 S.Ct. 1195, 75 L.Ed.2d 439 (1983); Ward v. Pennsylvania New York Central Transportation Co., 456 F.2d 1046, 1048 (2d Cir.1972). "A district court not only may but should protect its ability to carry out its constitutional functions against the threat of onerous, multiplicitous, and baseless litigation." Abdullah, 773 F.2d at 488 (citing Martin-Trigona, 737 F.2d at 1262).
 
 
 24
 As our prior cases have indicated, the district court, in determining whether or not to restrict a litigant's future access to the courts, should consider the following factors: (1) the litigant's history of litigation and in particular whether it entailed vexatious, harassing or duplicative lawsuits; (2) the litigant's motive in pursuing the litigation, e.g., does the litigant have an objective good faith expectation of prevailing?; (3) whether the litigant is represented by counsel; (4) whether the litigant has caused needless expense to other parties or has posed an unnecessary burden on the courts and their personnel; and (5) whether other sanctions would be adequate to protect the courts and other parties. Ultimately, the question the court must answer is whether a litigant who has a history of vexatious litigation is likely to continue to abuse the judicial process and harass other parties.
 
 
 25
 Looking to these factors, we have no doubt that the circumstances here called for some restriction on Safir's future federal litigation. For twenty years, Safir has sought redress in the federal courts for those pricing practices of defendants which occurred in 1965 and 1966. Admittedly, some of Safir's lawsuits, far from being frivolous, were meritorious. Nevertheless, he has repeatedly asserted the same claims in slightly altered guise and has used the courts to block and hinder various business transactions of the defendants.
 
 
 26
 Significantly, most of Safir's claims have been resoundingly rejected by the courts. For instance, Safir failed to persuade the courts (1) that section 810 required the maritime officials to recover all subsidies paid to the violating carriers during the period of violation, Safir II, 432 F.2d at 140-42, or any subsidies paid to the non-competing carriers, id. at 145 n. 2; Safir v. Kreps, 551 F.2d 447, 453-54 (D.C.Cir.), cert. denied, 434 U.S. 820, 98 S.Ct. 60, 54 L.Ed.2d 76 (1977); (2) that the involved shipping lines were barred perpetually from receiving subsidies even after their unlawful conduct ceased, Safir II, 432 F.2d at 140; (3) that he was entitled to pursue a claim under the False Claims Act, Safir v. Blackwell, 579 F.2d 742, 745 (2d Cir.1978), cert. denied, 441 U.S. 943, 99 S.Ct. 2160, 60 L.Ed.2d 1044 (1979); (4) that he had standing to appeal the Secretary of Commerce's decision on the amount the subsidies properly recovered, Safir v. Dole, 718 F.2d at 479-81; or (5) that he may share in the government's recovery of subsidies on a "common fund" theory, id. at 480. More important, Safir has continued to assert many of these same claims after their rejection.
 
 
 27
 In addition, some of Safir's somewhat novel litigation tactics can only be characterized as senseless and unduly burdensome. He moved to dismiss one appeal on the ground that the defendants had conspired to bribe President Nixon to defeat his litigation. He also sought to discover the "Nixon tapes" in the belief that officials in the Nixon administration conspired with the defendants to prevent him from vindicating his rights. In another action, he sought to have the judge disqualified because he allegedly was a friend of President Nixon.
 
 
 28
 Similarly, Safir has sought collateral relief pendente lite in many of his actions, including this one, alleging that the defendants were dissipating their assets to prevent him from enforcing potential multi-million dollar judgments. In this regard, he has sought to enjoin the sale of ships, shares of stock and other assets and to have proceeds of such sales placed in escrow; to enjoin a stockholder's meeting; and to enjoin the government from paying subsidies to the defendants and from approving the sale of stock in which neither the buyer nor the seller were defendants in Safir's actions. In light of the patently meritless nature of these motions, they can be viewed only as attempts by Safir to harass the defendants.
 
 
 29
 Another example of such harassing and baseless litigation was more recently displayed when Safir brought involuntary bankruptcy proceedings against four of the defendants. That action was predicated on the untenable theory that because Safir was about to win prodigious judgments from the defendants, they would be unable to satisfy the claims and be forced into bankruptcy. The bankruptcy court found Safir's petition to be a clear abuse of the judicial process, and assessed costs and attorneys' fees against Safir. To date, Safir has not paid those costs or fees.
 
 
 30
 We therefore cannot ignore the obvious fact that mere dismissal of this action will not hinder Safir from initiating further similar proceedings. Safir's abuse of the judicial process, despite his subjective conviction that he has suffered an unremedied injury, cannot be countenanced. In addition, Safir's failure to pay costs and fees already assessed against him indicates that other types of sanctions would be unavailing. Accordingly, we hold that the district court was fully justified in permanently enjoining Safir from instituting further vexatious, harassing or repetitive proceedings arising out of the 1965-1966 pricing practices of defendants.
 
 
 31
 Nevertheless, the injunction, which precludes Safir from instituting any action whatsoever, is overly broad. Although we are unable to divine any relief still available to Safir arising out of, or relating to, those events, we do not wish to foreclose what might be a meritorious claim. Consequently, we modify the injunction to provide that Safir is prevented only from commencing additional federal court actions relating in any way to defendants' pricing practices or merchant marine subsidies during the 1965-1966 period without first obtaining leave of the district court. Cf. Abdullah, 773 F.2d at 488; Martin-Trigona, 737 F.2d at 1262.
 
 C. Safir's Motion to Amend His Complaint
 
 32
 After judgment was entered in this case, Safir moved for permission to file an amended complaint. Despite the mandate of Fed.R.Civ.P. 15(a), that leave to amend a pleading "shall be freely given when justice so requires," we find that Judge Nickerson did not abuse his discretion in denying Safir's request. See generally Foman v. Davis, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962) (enunciating standard to be employed under Rule 15(a)).
 
 III. CONCLUSION
 
 33
 For the reasons stated above, we affirm the judgment of the district court, as modified.