**Marshall P. SAFIR, Plaintiff,**

v.

**Philip M. KLUTZNICK, Secretary of Commerce, et al., Defendants,**

and

**United States Lines, Inc., et al., Intervening Defendants.**

Civ. A. Nos. 74–1474, 74–1788 and 75–0077.

United States District Court, District of Columbia.

·Nov. 6, 1981.

---

Marshall P. Safir, pro se.

Allen van Emmerik, Atty., Dept. of Justice, Washington, D. C., with whom Thomas S. Martin, Acting Asst. Atty. Gen., and Charles F. C. Ruff, U. S. Atty., Washington, D. C., were on the brief, for federal defendants.

Robert T. Basseches and Daniel H. Margolis, Washington, D. C., on the brief, for intervenors-defendants American President Lines, Ltd., Prudential Lines, Inc., and PSS Steamship Co., Inc.

Verne W. Vance, Jr., Boston, Mass., on the brief, for intervenor-defendant Farrell Lines, Inc.

J. Franklin Fort, Washington, D. C., with whom T. S. L. Perlman and William H. Fort, Washington, D. C., on the brief, for intervenors-defendants Lykes Bros. Steamship Lines, Inc. and Moore-McCormack Lines, Inc.

Margaret T. Chao, Washington, D. C., on the brief, for intervenor-defendant American Export Lines, Inc.

Elmer C. Maddy, New York City, on the brief, for intervenor-defendant United States Lines, Inc.

## MEMORANDUM AND ORDER

BRYANT, District Judge.

### I. The Sapphire Litigation

In 1964 Marshall P. Safir and his brother-in-law, Arnold Weissberger, incorporated the Sapphire Steamship Lines, Inc. ("Sapphire"). Sapphire, together with its affiliated service organizations, Pioneer Overseas Services Corporation, a traffic management agency wholly owned by Mr. Safir, and Liberty-Pac International Corporation, a freight forwarder specializing in the overseas transportation of household goods and wholly owned by Mr. Weissberger, was founded to promote an innovative entrepreneurial plan. Typically, household goods were shipped abroad for the military by a single carrier who would take responsibility for all the local and ocean transport. These household goods were generally boxed in plywood containers. Sapphire and its affiliates planned to use twenty-foot metal containers to ship such goods. In 1965 this seemingly mundane innovation, then currently in use in domestic shipping, had considerable repercussions. According to the Sapphire promoters, unlike the wood boxes the metal containers are reusable. They can be made larger and thus cut down on handling charges. The metal containers are also stronger and can thus be stored on the deck of a ship with less likelihood of damaging the goods.[1]

In 1965 Sapphire sought to enter the military household goods market and filed proposed rates with the Military Sea Transport Service. At that time the market was dominated by the Atlantic and Gulf American Flag Berth Operators (AGAFBO), a conference of American shippers. Nine subsidized steamship operators were members of the AGAFBO conference in 1965: American Export Isbrandtsen Lines, Inc. (AEL), Bloomfield Steamship Company (Bloomfield), Lykes Bros. Steamship Co., Inc. (Lykes), Moore-McCormack Lines, Incorporated (Mor-Mac), United States Lines, Inc.

---

1. See September 28, 1964 letter from Stanley L. Temko, Covington & Burling, to Thomas D. Morris, Assistant Secretary of Defense, regarding "Request for Approval of New Mode of Transportation for Household Goods," Administrative Record (hereinafter "A.R."), vol. VII at 5351–57.

(USL), American President Lines, Ltd. (APL), Farrell Lines Incorporated (Farrell), Grace Lines, Inc. (Grace), and Prudential Lines, Inc. (Prudential). AGAFBO was a shipping conference which allowed member lines to agree on a rate schedule and then negotiate for contracts with the government.

Sapphire filed rates on the routes between the United States and United Kingdom and the Bordeaux-Hamburg range (U.K./B–H range) that seriously undercut the corresponding AGAFBO rates. When the government approved Sapphire's rates, AGAFBO countered by trying to undercut Sapphire with low prices of its own. Conference members lobbied with government agencies to revoke the approval of the Sapphire enterprise and also sought to pressure various van lines to prevent their cooperating with the new enterprise. Finally, after one of their member lines resigned rather than heed the AGAFBO rate schedule AGAFBO lowered its prices to fully meet the Sapphire challenge. AGAFBO, which under the existing arrangements with the government had been arguing strenuously and at regular intervals that its prices were justified by the high costs of shipping the military's cargo, was placed in the uncomfortable position of filing new prices that radically reduced the AGAFBO rates. Concurrent with its application for reduced rates, AGAFBO notified the military that these reduced rates were temporary and for competitive purposes only, and that the rates were not fair, reasonable or compensatory.[2]

Soon after AGAFBO reduced its rates for shipping military goods on the U.K./B–H range the Federal Maritime Commission (FMC) began, on its own initiative, an investigation of the shipment of military cargo. The investigation focused on AGAFBO conference and Sapphire.[3]

AGAFBO renewed its bargain rates at thirty-day intervals between March 29, 1965 and March 1, 1966. Sapphire commenced operations in 1965 and continued to carry cargo, although with steadily mounting losses, well into 1966. By March of 1967 Sapphire was forced to file for bankruptcy.

In 1966 Sapphire filed a treble damage antitrust suit seeking twelve million dollars from the AGAFBO lines. When Sapphire went bankrupt in 1967 a trustee was substituted as plaintiff in the treble damage suit. At this point the plaintiff in this suit and Sapphire's chief executive officer, Marshall Safir, was forced to stand aside and watch special counsel appointed by the trustee handle the antitrust lawsuit. Special Counsel proceeded to accept the defendant's offer of 1.6 million dollars and it was only after Sapphire's creditors intervened that the bankruptcy court withdrew approval of this settlement. Special counsel then accepted a settlement offer of two million dollars and was again frustrated by the bankruptcy court. A third offer of about 2.5 million dollars was ultimately approved by the bankruptcy court. *In re Sapphire Steamship Lines, Inc.*, 509 F.2d 1242 (2nd Cir. 1975). According to Mr. Safir this money went entirely to satisfy the claims of Sapphire creditors. Far from receiving compensation, Mr. Safir was left in even deeper personal financial straits by the settlement of the antitrust suit.[4]

2. "[T]he rate is filed purely as a competitive action to protect the interests of all the inland carriers and AGAFBO member lines who have carried this TGBL [through government bill-of-lading] cargo since the inception of this movement and . . . we do not feel the rate is fair, reasonable or compensatory." Minutes of March 12, 1965 AGAFBO meeting *quoted in Sapphire Steamship Lines, Inc. v. AGAFBO*, 3 Maritime Subsidy Board, Maritime Administration, Department of Commerce Reports (hereinafter "MSBMADCR") 199 (recommended decision of Chief Hearing Examiner Pfeiffer). *See also* February 24, 1966 letter from R. L. Hansen, AGAFBO Secretary to Vice Admiral Glynn Donaho, Commander Military Sea Transportation Service, A.R. at 1787.

3. The Trans-Pacific American-Flag Berth Operators and the West Coast American-Flag Berth Operators were also named as respondents, but the investigation dwelled largely on AGAFBO and the new Sapphire line.

4. *See* June 11, 1975 affidavit of Marshall P. Safir, *printed in* vol. 2784 Records & Briefs, United States Court of Appeals for the District of Columbia at 279–82 (joint appendix).

On December 12, 1967 the FMC handed down a 35-page "Report." The principal findings were two-fold:

AGAFBO's rates, which were reduced to an admittedly noncompensatory and unreasonable level in an attempt unfairly to compete with Sapphire[,] were so unreasonably low as to be detrimental to the commerce of the United States contrary to the provisions of section 18(b)(5).[5]

AGAFBO, by reducing its rates to an admittedly noncompensatory and unreasonable level in an attempt unfairly to compete with Sapphire, violated section 15 [6] by knowingly setting rates which were contrary to section 18(b)(5) and which were detrimental to commerce and contrary to the public interest.[7]

After receiving the FMC's findings Sapphire wrote the Acting Maritime Administrator and the Maritime Subsidy Board ("MSB") asking that the government proceed against the AGAFBO member lines under § 810 of the Merchant Marine Act, 1936, 46 U.S.C. § 1227. Section 810 directs that no government subsidy of any kind shall be paid to shipping lines who agree among themselves to a practice which is unjustly discriminatory or unfair to an American line. Sapphire sought to have the government cease all subsidy payments to AGAFBO member lines and recover all subsidies paid to those lines since March 29, 1965, the date AGAFBO reduced its rates.[8]

When the Maritime Administration[9] failed to act on Sapphire's request, the shipping line sued in the federal court in New York. Although the suit was dismissed in the district court, *Safir v. Gulick*, 297 F.Supp. 630 (E.D.N.Y.1969), the United States Court of Appeals for the Second Circuit ruled in Sapphire's favor. The court reasoned that § 810 was passed primarily to address the "burden which subsidies impose on the competitive position of the victim" of unfair practices. *Safir v. Gibson*, 417 F.2d 972, 977 (1969), *cert. denied*, 400 U.S. 850, 91 S.Ct. 57, 27 L.Ed.2d 88 (1970). Although the statute does not expressly call for the recovery of subsidies improperly paid in the past, the court concluded that "common law principles would permit [such recovery] under the subsidy contract in the absence of a statutory prohibition, and we find no such prohibition here." *Id.* Finally, the court concluded that although the Maritime Administrator may have some discretion in recovering past subsidies, the government must "consider[ ] the interest of the victim, about which Congress was so concerned" and reach a "considered decision." *Id.* at 978.

After remand, the Maritime Administration directed the Maritime Subsidy Board (MSB) to commence hearings to determine whether AGAFBO violated § 810. Sapphire objected to this procedure, arguing that the Federal Maritime Commission had already concluded that AGAFBO had violated § 15 and that such a § 15 violation was necessarily also a violation of § 810.

5. Section 18(b)(5) of the Merchant Marine Act of 1936, 46 U.S.C. § 817(b)(5) directs the FMC to disapprove "any rate or charge filed by a common carrier by water in the foreign commerce of the United States or conference of carriers which, after hearing, it finds to be so unreasonably high or low as to be detrimental to the commerce of the United States."

6. Section 15 of the Merchant Marine Act of 1936, 46 U.S.C. § 814 directs the FMC to disapprove any agreement "that it finds to be unjustly discriminatory or unfair as between carriers, shippers, exporters, importers, or ports . . . or to operate to the detriment of the commerce of the United States, or to be in violation of this chapter . . . ."

7. Report on Rates on Government Cargoes, Docket No. 65–13, Federal Maritime Commission at 32; A.R. at 32.

8. *See* December 21, 1967 letter from Mitchell W. Rabbino to James Gulick, Acting Administrator, Maritime Subsidy Board, A.R. at 38.

9. By Reorganization Plan No. 21 of 1950, 64 Stat. 1273, and Reorganization Plan No. 7 of 1961, 75 Stat. 840, the regulatory functions of the United States Maritime Commission were transferred to the Federal Maritime Commission, an independent agency, and the functions relating to the award, amendment, and termination of subsidy contracts were transferred to the Maritime Administration, an agency within the Department of Commerce.

After again failing to gain relief within the Maritime Administration or the federal district court, Sapphire made its argument before the Second Circuit. Judge Friendly, writing his second opinion in the Sapphire saga, again held for the plaintiff. *Safir v. Gibson*, 432 F.2d 137, *cert. denied, American Export Isbrandtsen Lines, Inc. v. Safir*, 400 U.S. 942, 91 S.Ct. 241, 27 L.Ed.2d 246 (1970). Section 15 requires the FMC to disapprove unjustly discriminatory or unfair agreements between shippers. Section 810 prohibits the payment of subsidies to lines which agree to engage in a practice which is unjustly discriminatory or unfair to an American line. Judge Friendly held that the finding of a § 15 violation by the FMC did indeed necessitate a finding of a § 810 violation by the MSB. By its participation in the earlier FMC proceeding, AGAFBO was thus collaterally estopped from relitigating the issue. The Second Circuit ordered that the Maritime Administration be directed not to redetermine the issue of AGAFBO's "unjustly discriminatory or unfair" price reductions. In so doing the court was careful to note that by its opinion it did not intend to preclude the Maritime Administration from "investigating the nature and extent of the individual carriers' participation in the illegal action, should it find these matters relevant to its ultimate decision on whether to seek recovery of subsidies paid during the violation and, if so, how much and from whom." 432 F.2d at 145 n.2.

## II. *Proceedings before the Maritime Administration*

Once again the Maritime Subsidy Board had the responsibility of resolving the Sapphire dispute. Chief Hearing Examiner Paul N. Pfeiffer of the MSB issued a 100-page decision based on lengthy hearings that make up the bulk of the administrative record in the case before the court. After first resolving all the preliminary disputes over Sapphire's common carrier status in Sapphire's favor, Judge Pfeiffer held that § 810 mandated the imposition of some penalty on AGAFBO's members. Judge Pfeiffer refused to credit the respondents' claims that they relied on the expert advice of counsel [10] and that they reduced their rates in response to pressure from the Department of Defense. According to Judge Pfeiffer, although AGAFBO did consult with counsel, the organization's members knew full well that selective, discriminatory and noncompensatory price reduction were against the law.

Under the circumstances of record, the contention that astute AGAFBO shipping executives accepted legal advice to the effect that concerted price reductions to incremental cost levels were lawful, and therefore they are not responsible if the advice was incorrect, cannot be credited. The great preponderance of the evidence establishes a predatory intent by AGAFBO concerted action to restrain U. S. flag competition which any ordinary businessman should have known was illegal.[11]

Similarly, although the military was indeed concerned with high AGAFBO rates, Judge Pfeiffer found no evidence that the military encouraged AGAFBO to reduce those rates to noncompensatory levels on a selective and discriminatory basis.[12]

In responding to the mandate of the Second Circuit to determine "how much" subsidy should be recovered and "from whom," Judge Pfeiffer carefully calibrated the culpability of each AGAFBO member. But Judge Pfeiffer began with an unstated premise: the maximum subsidy recoverable

---

**10.** Recommended Decision at 43–60, 3 MSBMADCR 196–205, A.R. at 5704–21.

Both the Hearing Examiner's Recommended Decision and the Maritime Subsidy Board's Opinion and Order appear in three places, each with its own pagination. For the convenience of the litigants, who may have access to different reprints of these documents, the court will provide three parallel citations: the original document, the reprint in volume three of Mari-

time Subsidy Board Maritime Administration Department of Commerce Reports ("MSBMADCR") and the Administrative Record ("AR").

**11.** Recommended Decision at 60, 3 MSBMADCR 205, A.R. at 5721.

**12.** Recommended Decision at 62–63, 3 MSBMADCR 206–09, A.R. at 5723–24.

is that percentage of the subsidy received that is allocatable to Trade Route 21 (hereinafter T.R. 21), the United Kingdom/Bordeaux-Hamburg route served by Sapphire. The hundreds of millions of dollars of subsidies paid to the offending lines for other routes were, despite the plaintiff's urgings, never considered as ripe for recovery.

Among the AGAFBO lines Judge Pfeiffer assessed Lykes, the chief offender, the full amount of subsidy paid for T.R. 21. In addition, Lykes was to repay miscellaneous subsidies received by way of tax deferments, preference cargoes, and certain ship purchase agreements.[13]

AEL, the next offending line, although not the leader in the predatory priced reductions, was held by Judge Pfeiffer to be culpable as well. In calculating the subsidy recovery Judge Pfeiffer introduced a further innovation: AEL must refund only that percentage of T.R. 21 subsidy allocable to the kind of cargo that Sapphire carried. Thus since only about a fifth of AEL's T.R. 21 was military and household goods, Judge Pfeiffer reduced the operations subsidy recovery by four-fifths.[14] The identical prorating calculation was employed to arrive at subsidy recoveries for Moore McCormack Lines, U.S. Lines and Bloomfield, except Bloomfield's subsidy recovery was further reduced by 50% due to its marginal role in the rate reductions. In addition, subsidies received by virtue of the purchase of government ships and various other subsidies were ordered repaid by the remaining lines.[15] Finally, Judge Pfeiffer held that the "non-trade lines", those AGAFBO members who were not competitors of Sapphire and did not vote on the price reductions, need not refund any subsidies.[16]

To summarize, Judge Pfeiffer began his assessment of penalties by limiting subsidy recovery to those subsidy payments made for T.R. 21. After dispensing with Lykes, the chief offender, Judge Pfeiffer further limited the subsidy recovery to the percentage of T.R. 21 subsidy that represents support of military and household goods cargo. Finally, Judge Pfeiffer reduced Bloomfield's already twice narrowed penalty by 50%. Total subsidies to be recovered under the recommended decision were approximately ten million dollars.

All parties filed exceptions to Judge Pfeiffer's recommended decision before the Maritime Subsidy Board.[17] After hearing oral argument the MSB handed down a lengthy opinion and order on April 16, 1973.[18] Although certain of Judge Pfeiffer's findings were adopted, the three-member board decided the bulk of the controversy anew with results divergent from those recommended by their hearing examiner.

To begin with the MSB adopted Judge Pfeiffer's recommendations regarding Sapphire's common carrier status and its other qualifications for protection under § 810. The MSB then held that the four "non-trade lines"—the AGAFBO member lines not competing directly with Sapphire—had committed technical violations by their continued membership in a conference that was unjustly discriminating against Sapphire.[19] Reaching the crux of the dispute, the MSB reviewed the various factors proffered by AGAFBO to justify mitigating recovery of subsidies. The Board recounted the early 1965 flurry of exchanges between AGAFBO and various military personnel regarding AGAFBO rates, but concluded

---

13. Recommended Decision at 74–75, 3 MSBMADCR 213–14, A.R. at 5734–35.

14. Recommended Decision at 79, 3 MSBMADCR 215–16, A.R. at 5739.

15. Recommended Decision at 80–92, 3 MSBMADCR 216–22, A.R. at 5740–52.

16. Recommended Decision at 93–97, 3 MSBMADCR 222–25, A.R. at 5753–57. These "non-trade lines" include Farrell, Grace, Prudential and APL.

17. Non-trade lines, obviously content with Judge Pfeiffer's finding of no liability, objected only to certain technicalities in the recommended decision. A.R. at 5997–6002. Public Counsel waived any exceptions. A.R. at 6079.

18. Opinion and Order, 3 MSBMADCR 128, A.R. at 6249.

19. Opinion and Order at 17–18, 3 MSBMADCR 139–40, A.R. at 6267–68.

that military pressure was a minor reason for AGAFBO's price reductions.[20] Similarly, AGAFBO's alleged reliance on the advice of counsel was dubbed of "background" importance.[21] Although the opinion is not entirely clear on the point, it appears that the Board also lent some credence to AGAFBO's claim that their price reductions were motivated by the altruistic goal of helping AGAFBO-affiliated, land-based van lines who were threatened by Sapphire's affiliated Liberty-Pac van line. The Board saw AGAFBO's self-interest, however, as central to the price reduction.[22] Further, the Board obviously felt constrained by the Second Circuit's opinion holding the earlier FMC ruling to be res judicata. Thus, the Board reiterated the FMC ruling that the AGAFBO price reduction was a predatory one.[23] Finally, the Board determined that the threat of dissolution, partially realized when one line resigned in April 1965 to better compete with Sapphire's rates, was a significant factor in AGAFBO's decision to continue the rate reductions through the eleven-month period.[24]

While the Board reviewed and acknowledged the impact of some of the mitigating factors mentioned above, it nevertheless reached much the same ultimate conclusion as did Judge Pfeiffer: "Sapphire's operation was of overriding concern in any AGAFBO action in the U.K./B–H range."[25] Where the hearing examiner and the Board really diverge is in the level of recovery of subsidies.

The MSB interpreted the provision in § 810 which states that "no payment or subsidy of any kind shall be paid directly or indirectly . . . to any contractor or charterer who shall violate this section" as governing operating-differential subsidies (ODS) only. The assorted other subsidies which the hearing examiner recommended be refunded[26] were held by the Board to be outside the purview of § 810.[27]

The Board apparently also felt that the unique setting of the case dictated further limitations on the recovery of subsidies. Following Judge Pfeiffer's recommendation, the MSB limited the recovery to those subsidy payments made for the operation of T.R. 21.[28] The Board went on to prorate the recovery from all the offending lines of even these subsidies by the percentage of military cargo revenues earned by the offending lines on T.R. 21.[29] To summarize the Board's holdings, it construed § 810 as covering only ODS and then determined to recover only "the percentage of ODS received from subsidized operations on the U.K./B–H range, as represented by the ratio of military cargo revenue received on such route to total revenues received therefrom during the period of violation."[30]

Next the Board considered the individual mitigating circumstances of each of the trade lines to determine whether to mitigate the subsidy recovery beyond the above formula. The Board found no basis for such a reduction in the case of Lykes, but

**20.** Opinion and Order at 31–21, 3 MSBMADCR 148–49, A.R. at 6281–82.

**21.** Opinion and Order at 34–35, 3 MSBMADCR 150–51, A.R. at 6284–85.

**22.** Opinion and Order at 39, 3 MSBMADCR 153–54, A.R. at 6289.

**23.** Opinion and Order at 41–44, 3 MSBMADCR 155–157, A.R. at 6291–94.

**24.** Opinion and Order at 41, 3 MSBMADCR 154–55, A.R. at 6291.

**25.** Opinion and Order at 44, 3 MSBMADCR 157, A.R. at 6294.

**26.** Opinion and Order at 54, 3 MSBMADCR 163, A.R. at 6304.

**27.** Opinion and Order at 60, 3 MSBMADCR 166–67, A.R. at 6310.

**28.** Opinion and Order at 60, 3 MSBMADCR 167, A.R. at 6310.

**29.** Opinion and Order at 61, 3 MSBMADCR 167, A.R. at 6311. Judge Pfeiffer allowed the identical military cargo only limitation on subsidy recoveries for all the shipping lines except for Lykes, the line Judge Pfeiffer held to be the chief offender. *See e. g.*, Recommended Decision at 79, 3 MSBMADCR 215–16, A.R. at 5739.

**30.** Opinion and Order at 62, 3 MSBMADCR 168, A.R. at 6312.

reduced AEL's, Mor-Mac's and Bloomfield's payment 25%, and USL's 50%.[31] In total the Board required a refund of approximately 2.8 million dollars of ODS from the five offending AGAFBO member lines.

The trade and non-trade lines all petitioned for review of the Board's order by the Secretary of Commerce. The Secretary, Frederick B. Dent, issued a five-paragraph order granting the petitions in part. The technical violation by the non-trade lines was sustained, as was the mitigation of all recovery from the non-trade lines. The Secretary evidently concluded, however, that the Board had been altogether too harsh in assessing the subsidy recoveries against the trade lines:

> The record indicates that the United States Government actively induced the rate reductions here in issue, and received substantial financial benefit from such reductions. The record further supports the conclusion that, but for the active inducement of federal officials, rates found by the Federal Maritime Commission previously not to have been unreasonably high would not have been reduced to noncompensating levels by respondents.[32]

The Secretary, without further explanation, reduced the total refund to approximately 1.1 million dollars. A table attached to Secretary Dent's order indicates that he adopted the Board's formula of limiting recovery to subsidies paid for T.R. 21 and prorating recovery according to the percentage of military cargo carried by each line. But Secretary Dent took the resulting figures, halved them due to "government inducement" and then further reduced the resulting figures along the same lines as the Board's order, except that Bloomfield's repayment was reduced an additional 50% and not just the 25% specified by the Board.

III. *Federal Court Proceedings*

On October 7, 1974 the plaintiff in this case and former 50% stockholder in Sapphire, Mr. Marshall P. Safir, filed a complaint in this court. By this complaint Mr. Safir sought to compel the Secretary of Commerce and the Maritime Administration to recover all subsidies paid to the AGAFBO lines during the eleven-month period of violation of § 810 and to cease all further subsidy payments to the same lines. After briefing and oral argument the court granted the Secretary of Commerce and the intervening lines' motions for summary judgment.

In December 1974 the trade lines filed suit in this court to reverse the Secretary of Commerce's Order holding them liable for over a million dollars in subsidy recoveries. *See* Complaint for Review of Agency Action and for Declaratory Judgment and Injunctive Relief, Civil Action No. 74–1788 (December 6, 1974). The next month the non-trade lines filed a similar suit seeking the reversal of the Secretary's finding that the non-trade lines technically violated § 810. *See* Complaint for Review of Agency Action and for Declaratory Judgment and Injunctive Relief, Civil Action No. 75–0077 (January 16, 1975). This court ordered the two AGAFBO complaints consolidated with Mr. Safir's suit in April 1978.

On appeal of the dismissal of Mr. Safir's suit the United States Court of Appeals for the District of Columbia reversed the summary judgment orders and remanded the case. The court ruled that Mr. Safir had standing to sue, that he had satisfactorily exhausted his administrative remedies and that he was not collaterally estopped from litigating the question of whether the Maritime Subsidy Board and/or the Secretary of Commerce abused their discretion in mitigating the subsidy recovery. *Safir v. Kreps*, 551 F.2d 447, *cert. denied*, 434 U.S. 820, 98 S.Ct. 60, 54 L.Ed.2d 76 (1977).

Presently before the court are the parties' renewed motions for summary judgment. The issues are largely those outlined in Judge Wright's opinion on appeal. The court must first decide what factors the MSB and Secretary could properly consider in exercising their discretion to mitigate the

---

**31.** Opinion and Order at 63–67, 3 MSBMADCR 168–71, A.R. at 6313–17.

**32.** Opinion and Order at 67–69, 3 MSBMADCR 171–72, A.R. at 6317–19.

subsidy recovery. Next the court must determine the appropriate standard of review to evaluate the factual holdings made by the MSB and the Secretary. Finally, the court must apply that standard in reviewing the administrative decisions.

## IV. *Mitigation of § 810 Subsidy Recovery*

Legislative history is a notoriously capricious source of enlightenment. To those devotees of § 810, the gods have not been particularly kind.

On June 18, 1936 during the Senate floor debate over the Merchant Marine Act of that year Senators O'Mahoney and Clark voiced concerns about possible discrimination under the new law. Both senators referred to testimony before the Senate Committee on Commerce regarding a conference of shipping lines, six foreign and one subsidized American line, that controlled the South Africa trade route. These seven lines would not admit an unsubsidized American line into the conference and were purportedly trying to force the unsubsidized American line out of business.[33] After expressing some dismay that the pending bill should have reached the Senate floor without a provision designed to prevent such discrimination by a subsidized American line, Senator O'Mahoney inquired:

> Would it not be a simple matter to provide by amendment that no subsidy of any kind or character shall be paid to any shipping line or shipping concern which has entered into an arrangement to destroy any other American line? [34]

The next day Senator O'Mahoney offered § 810 as an amendment to the Merchant Marine Act.

> It is my purpose in presenting this amendment to make it clear to the [Maritime] Commission that it is the intention

of Congress not to pay subsidies of any kind to any American line which is willing to enter into any combination with other lines, including those operating under foreign flags, to crush American competition.[35]

Without any further scrutiny or debate on record, § 810 was incorporated into the Merchant Marine Act of 1936 and passed into law. That section, despite an attempt in 1938 to repeal it,[36] has remained in the precise form Senator O'Mahoney introduced in June 1936.

As is clear from the above, the legislative purpose in denying "subsidies of any kind" to offending American lines is unequivocal. But neither the statute itself nor any reference in the legislative history sheds light on whether Congress intended the Maritime Administration to *recover* subsidies paid to offending lines during the period of their violation. The United States Court of Appeals for the Second Circuit was presented this question in *Safir v. Gibson*, 417 F.2d 972 (1969). The Second Circuit reasoned that few complaints of § 810 violations will be resolved before subsidy payments are made. Since Congress was primarily concerned with the competitive position of the victim, the court reasoned, recovery of the subsidies already paid will serve the laudatory purpose of posing "an added cost on the violators and thus will partially make up to the victim for the burden which earlier payments indirectly imposed on him." [37] The Second Circuit thus concluded that "[a]lthough the statute does not expressly authorize the Maritime Administrator to recover subsidies improperly paid in the past, common law principles would permit this under the subsidy contract in the absence of

---

33. 80 Cong.Rec. 9921 (1936). Messrs. Gardner and Basseches, attorneys for APL, submitted to the Maritime Administrator a *Compilation of Legislative History of Section 810, Merchant Marine Act, 1936. See* A.R. at 5786–5828. Although the court has not relied on this compilation, it was prepared prior to the events pertinent to this suit and gives every sign of being thorough and accurate.

34. 80 Cong.Rec. 9922 (1936).

35. 80 Cong.Rec. 10076 (1936).

36. A thorough rendition of the course of the 1938 amendments to the Merchant Marine Act is presented in *Compilation, supra* note 33 at 16–30, A.R. at 5803–5816.

37. 417 F.2d at 977.

a statutory prohibition, and we find no such prohibition here." [38]

The Second Circuit left open in 1969 the question of whether the Maritime Administrator was obligated to recover all subsidies paid during the violation or whether it could exercise discretion in limiting the recovery of such subsidies. The court seemed, however, to lean toward allowing some discretion on the part of the Maritime Administrator, noting that the "duty of the Administrator may be less absolute than is the obligation to cease payments to current violators." [39] When it had the Sapphire litigation back before it in 1970 the Second Circuit again broadly intimated that the Maritime Administrator may well have discretion regarding how much of the subsidies to recover.[40]

After this court granted summary judgment for the intervening lines, the United States Court of Appeals for the District of Columbia considered the issue of the Maritime Administration's discretion to limit the extent of subsidy recovery. The Court of Appeals affirmed this court's rejection of Mr. Safir's contention that § 810 imposed an "inflexible" "mandatory duty ... to recover all construction and operating subsidies paid ...." [41] But the Court of Appeals agreed with Mr. Safir that this court must still consider whether the Maritime Administration exercised what discretion it had in a permissible manner.[42] The court broke the issues remaining on remand into two parts: whether the Administrator acted properly in considering various factors in mitigation and whether the Administrator acted arbitrarily or capriciously, or abused his discretion in applying whatever factors were permissible to the facts in this case.[43]

### A. The Factors Appropriate for the Maritime Administration to Consider in Mitigating the Subsidy Recovery

The Court of Appeals ruled that in discharging the Second Circuit's mandate in this case the Maritime Administrator was entitled to consider "[the nature and] extent of the individual carriers' participation in the illegal action." [44] This court must now decide what factors beyond the level of participation in the events leading to the § 810 violation should properly be considered in mitigating the subsidy recovery. Over the course of this case's passage through the Department of Commerce's administrative machinery either the hearing examiner, Judge Pfeiffer, the Maritime Subsidy Board or the Secretary of Commerce considered over a half-dozen factors which one or more of these levels felt might warrant mitigation of the subsidy recovery.

### 1. Section 810 Related Factors

■ Implicit in the Second Circuit's determination that something less than full recovery would be permissible is the conclusion that recovering subsidies already paid is qualitatively different from the nonpayment of subsidies that are to accrue in the future. Most obviously, the statute itself compels the recognition of this distinction. While the statute is explicit that no subsidy shall be paid to a § 810 violator, neither the statute nor the legislative history ever refers to the duty to refund subsidies. As a result, what appears categorical as applied to future payments, may well allow for some discretion when applied to recoveries.

---

**38.** *Id.* The subsidy contract itself incorporates the prohibitions in § 810. *See* Public Counsel's July 31, 1972 Reply to Exceptions at 9, A.R. at 6101.

**39.** 417 F.2d at 977.

**40.** "Nothing we have said should be read as preventing the Maritime Administration from investigating the nature and extent of the individual carriers' participation in the illegal action, should it find these matters relevant to its ultimate decision on whether to seek recovery of subsidies paid during the violation and, if so,

how much and from whom." *Safir v. Gibson*, 432 F.2d 137, 145 n.2 (1970).

**41.** *Safir v. Kreps*, 551 F.2d 447, 453–54 (D.C. Cir.), *cert. denied*, 434 U.S. 820, 98 S.Ct. 60, 54 L.Ed.2d 76 (1977).

**42.** *Id.* at 454.

**43.** *Id.*

**44.** 551 F.2d at 454, *quoting Safir v. Gibson*, 432 F.2d 137, 145 n.2 (2nd Cir. 1970).

And there are some entirely sensible reasons to exercise such discretion here.

Section 810 has never been applied in its thirty-five year history. Thus, the AGAFBO lines can say with some justice that rousing a bear so long in hibernation to thoroughly maul an onlooker, with no forewarning, is hardly what Congress had in mind. The point is strengthened when the absence of any reference to subsidy recovery in the statute is considered. While traditionally because a law has not been applied is no defense to its violation, AGAFBO is undoubtedly right that no amount of vigilance could have forewarned AGAFBO, with certainty, of the full reach of § 810. When violation of a statute threatens the very existence of a business enterprise our businessmen have a right to know, with considerable exactitude, what penalty the statute exacts. But, the court's sympathy with AGAFBO is not boundless. If, to continue the metaphor, the intervening lines hadn't prodded the grizzly with an eleven-month campaign to destroy Sapphire it would doubtless be sleeping still. Section 810 might not have put AGAFBO's members on notice that they were in danger of losing their skins if they violated it, but there could have been little doubt that AGAFBO's activity would indeed violate § 810.[45]

The lack of notice of the full repercussions of a § 810 violation is particularly significant in the light of the legislative purpose in passing the Merchant Marine Act of 1936. As Judge Pfeiffer noted in his recommended decision, Congress had a dual purpose: to regulate the merchant marine and at the same time foster its development. Congress hardly could have intended to slip into this complex Act a single penal provision which would lull the industry into complacent violations and then drive them out of business. This is not to say that § 810 should be given no force and effect. That would deprive Mr. Safir of the § 810 protection on which he was entitled to rely—if he has not been so deprived long ago by the Maritime Administration's reluctance to proceed in this matter. Further, as the Second Circuit noted, in the nature of things most § 810 violations will be discovered after subsidies have already been paid. 417 F.2d at 977. Unless some substantial recovery is made, even in this, the first case, § 810 will lose whatever deterrent power it possesses.[46]

In summary, the rather unique posture of this case and the dire consequence to the maritime industry if § 810 is read to mandate recovery of all subsidies warrant the exercise of the Maritime Administrator's discretion to limit the recovery of subsidies. But that discretion must be exercised in a fashion that keeps both Congressional goals in mind.[47] Fostering the merchant marine at the expense of freeing it from enacted regulation is not a proper exercise of that discretion.

### 2. Factors Stemming from the Role of Individual Shippers

Both the Hearing Examiner and the Maritime Subsidy Board reviewed the facts surrounding AGAFBO's price reductions. Although the AGAFBO conference acted as a unit in reducing its members' shipping prices, not all AGAFBO members contributed equally to the enterprise. Lykes, for example, pushed early and hard to persuade the other AGAFBO-member lines to selectively and discriminately reduce their prices. Other lines, such as Bloomfield, were either tangentially involved in the

---

**45.** For a discussion of AGAFBO's purported assumption regarding the legality of its price reductions, see *infra* at ——.

**46.** If a company can violate § 810 and avoid all penalties by ceasing the unlawful practices when they are ultimately ruled in violation of § 810 by the Maritime Administration there is nothing to deter such violations in the first place.

**47.** As the Second Circuit noted in 1969, the Maritime Administration must proceed by making a "considered" decision that considers both the "interest of the victim, about which Congress was so concerned" and the maritime industry. *Safir v. Gibson*, 417 F.2d 972, 978.

AGAFBO meetings and operations or simply more reluctant then Lykes to collectively cut prices. The various levels of fervor with which the trade lines participated in the concerted activity that led to this proceeding has been ably charted and evaluated by the Maritime Administration.

### 3. *AGAFBO–Related Factors*

The Maritime Administrator also considered several factors specific to AGAFBO. These factors include AGAFBO's alleged reliance on the advice of counsel, alleged pressure exerted by the military on AGAFBO to lower its prices, and the threat posed to the AGAFBO organization by the Sapphire enterprise.

■ It is not entirely clear how much reliance, if any, AGAFBO placed on legal advice before AGAFBO lowered its prices. There is some indication that counsel consulted by AGAFBO supplied the unfortunate language in AGAFBO's letter to the authorities to the effect that AGAFBO's new prices were not fair, reasonable or compensatory. But during the hearings before Judge Pfeiffer the lawyer consulted by AGAFBO, Mr. Maddy, asserted the attorney-client privilege and AGAFBO did not pursue the matter further at the hearings by calling its own executives, who could presumably detail the legal advice they received. Regardless of the advice given by AGAFBO's counsel, the court is at a loss as to how such advice should operate to mitigate a § 810 recovery. When a citizen consults a lawyer and relies on the lawyer's advice, that reliance might conceivably justify mitigating a subsequent civil penalty. But such reliance on counsel's advice obviously must be reasonable and in good faith. *Cf. WADECO, Inc. v. F.C.C.*, 628 F.2d 122, 131–33 (D.C.Cir.1980) (Mikva, J. dissenting); *WEBR v. FCC*, 420 F.2d 158, 167 (D.C.Cir. 1969). The hearing examiner noted in his recommended decision that any ordinary businessman, not to mention "astute" AGAFBO shipping executives, should have known that AGAFBO's concerted effort to

restrain U.S. flag competition was illegal.[48] Reliance on counsel's advice that AGAFBO could lower its prices to a predatory level, if indeed such advice was ever given and credited, should not operate to mitigate subsidy recoveries.

■ The administrative record reflects that the military was concerned with the high level of AGAFBO's military contract prices. In 1965 there were allegations that AGAFBO was improperly charging the military more than its civilian customers and AGAFBO had been informed by the military that its prices would no longer be automatically certified as justifiable without more investigation. But none of this general concern for AGAFBO's system-wide pricing justifies AGAFBO's claim that it was induced into selectively and discriminatively lowering its prices on T.R. 21 by pressure from the military. As the Maritime Subsidy Board noted, if pressure from the military induced AGAFBO's dramatic and selective price reduction it is a mystery why AGAFBO returned its prices to their pre-reduction level eleven months later with such impunity.[49] Although the military may have orally advised AGAFBO that Sapphire's rates were some indication that AGAFBO should rethink its own system-wide pricing, the record does not support the conclusion that AGAFBO was dragged reluctantly into a § 810 violation by the military. Although the idea of throwing a sop to the military may have entered the mind of some of the AGAFBO executives, the record is clear that the dominant, if not overwhelming, motivation of AGAFBO was to stave off the threat of Sapphire's competition.

■ Finally, AGAFBO asserts that it acted out of concern for the AGAFBO organization itself and the AGAFBO van line affiliates. While by no means a total explanation for AGAFBO's actions, both reasons have the ring of truth to them. After AGAFBO first lowered its prices in re-

---

48. *See* note 11, *supra* and accompanying text.

49. Opinion and Order at 31–32, 3 MSBMADCR 148–49, A.R. at 6281–82.

sponse to Sapphire and Waterman left AGAFBO rather than conform to the partial price reduction, AGAFBO was undoubtedly concerned for the survival of the AGAFBO organization. Meeting Sapphire's prices fully had the effect of insuring that no other line felt compelled to leave AGAFBO in order to compete with Sapphire. But however logical such "self-preservation" may be, it is hardly a reason to mitigate subsidy recoveries. It is precisely because AGAFBO acted in concert to harm Sapphire that we have had twelve years of litigation. If AGAFBO members felt threatened by Sapphire they were free to resign as Waterman did and act independently.[50] Or AGAFBO could have acted as a group and lowered their prices across the board, on all routes, to the limit of compensatory levels. Instead AGAFBO chose a different route: to preserve AGAFBO by competing unfairly with Sapphire. Far from being a grounds for mitigation, it is the corpus of the offense.

Similarly, AGAFBO's alleged concern for its affiliated, land based van lines, who stood to lose business to Sapphire's affiliates, was entirely in its own self-interest. Naturally, AGAFBO did not want its affiliates, who were integral to its own business and heavily indebted to AGAFBO, to fail. But wishing business partners—and therefore yourself—well hardly qualifies as grounds to mitigate subsidy recoveries.

To summarize what has evolved over the years and the court cases into a rather complex business, there are three types of factors potentially operating to mitigate subsidy recovery: (1) general factors relating to the anomaly of implying a recovery provision into § 810; (2) factors relating to the nature and extent of individual shippers' participation in the price reduction; and (3) specific factors stemming from the motivations of AGAFBO and its membership to engage in the § 810 violation. The first set of factors employed by the Mari-

time Administration, involving the overall mitigation of subsidy recoveries from all lines due to the unusual posture of this case in recovering subsidies under § 810, has been reviewed and accepted by this court. The Second Circuit,[51] and the District of Columbia Circuit thereafter,[52] have directed that the Maritime Administration be permitted to take the second factor, the nature and extent of the individual shippers actions, into account in assessing recovery figures. This they have done and the court defers to those judgments. But the third set of factors, involving the motivations of individual AGAFBO members, is a different matter. The court has reviewed these factors as they were presented by various levels of decisionmakers in the administrative process and is unable to lend credence to any such mitigation factors.

### V. The Standard of Review

■ When the court of appeals remanded this case it left it to this court to determine whether the appropriate standard of review for the factual questions at issue is substantial evidence on the record as a whole under 5 U.S.C. § 706(2)(E) or whether under 5 U.S.C. § 706(2)(A) the facts found must be merely free of arbitrariness or caprice, given the evidence adduced. 551 F.2d at 454. Apart from rulemaking proceedings under a provision of the Administrative Procedure Act, the substantial evidence standard is ordinarily only applicable when a court is reviewing an adjudicatory hearing required by statute. See e. g., *Aircraft Owners and Pilots Ass'n v. F.A.A.*, 600 F.2d 965, 969 (D.C.Cir.1979). As Judge Wright noted about this case on appeal, "no statutory provision has been called to our attention which would authorize the Secretary, Administrator, or Board to adjudicate" this dispute. 551 F.2d at 455.

■ But the fact remains that the Maritime Administration provided for an elaborate adjudicatory hearing replete with the

---

**50.** It need hardly be added that even as independent lines AGAFBO's members would still have been prohibited by § 810 from using selective and discriminatory price schedules to harm Sapphire.

**51.** 432 F.2d at 145 n.2.

**52.** 551 F.2d at 454.

protections for the litigants provided in 5 U.S.C. §§ 556 & 557. Judge Wright went on to state that "we would be strongly inclined simply to ignore the procedural anomalies of this litigation and assume with the parties that the proper procedure is quasi-adjudicative and consequently the proper standard of review is substantial evidence on the record as a whole." 551 F.2d at 455. The court has now had an opportunity to review the parties' briefs on this issue and has concluded that substantial evidence is the appropriate standard of review.

The Supreme Court pointed out in *Citizens to Preserve Overton Park v. Volpe* that the administrative hearing in that dispute "was not designed to produce a record that is to be the basis of agency action—the basic requirement for substantial evidence. *See* H.R.Rep.No.1980, 79th Congress, 2nd Sess.", 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). Here the administrative hearing was designed specifically to produce a record that was to be the basis for the agency's decision,[53] and it would be overly formalistic to use anything but the substantial evidence test.

The court agrees with the intervenors,[54] however, that use of the arbitrary and capricious standard rather than the substantial evidence standard would not change the result in this case.[55] On those occasions when the court has sustained the Maritime Administration's findings it believes that those findings meet a substantial evidence standard. Conversely, when the court has found it necessary to reverse a Maritime Administration finding it is because such

finding both lacks substantial evidence and is arbitrary and capricious.

## VI. *Review of the Administrative Decisions*

As described earlier, after the Second Circuit ordered them in 1970 to give careful consideration to whether subsidies should be recovered, three separate levels of the Department of Commerce considered this case. Normally, the court would begin its review with the highest administrative level, the Secretary of Commerce. But in this case each successive level took the decision of its predecessor, modified some of its conclusions, and then sharply narrowed the subsidy recovery. In many respects the Maritime Subsidy Board took Judge Pfeiffer's recommended decision as a starting point for its own somewhat different resolution. To an even greater degree the Secretary of Commerce took the MSB's opinion as his premise. In other words, to the extent that the Secretary's sparse order can be called a sculpture, he began with a block of granite first quarried by Judge Pfeiffer and then radically cut away by the MSB. To evaluate the validity of this administrative decisionmaking it is thus necessary to start at the beginning with Judge Pfeiffer's recommended decision.

### A. *The Hearing Examiner's Recommended Decision*

Chief Judge Pfeiffer's legal assessment of the three sets of potentially mitigating factors is entirely in accord with this court's

---

**53.** October 24, 1969 Maritime Subsidy Board Order at 3, A.R. at 64 ("THEREFORE, IT IS ORDERED that the Chief Hearing Examiner (or his designee) act as the Representative of the Board and conduct an investigation pursuant to Section 214, Merchant Marine Act, 1936, as amended (46 U.S.C. § 1124), in accordance with the Board/Administration 'Rules of Practice and Procedure' published on October 22, 1964 (29 F.R. 14475), and compile a public record which will provide a basis for recommending to the Maritime Subsidy Board whether Section 810, Merchant Marine Act, 1936, as amended (46 U.S.C. § 1227), has been violated and the appropriate action that should be taken").

**54.** Supplemental Brief of Intervening Defendant "Trade Lines" on Plaintiff's Motion for Summary Judgment at 27–30.

**55.** *See Ethyl Corp. v. Environmental Protection Agency*, 541 F.2d 1, 37 (D.C.Cir.) (en banc), *cert. denied*, 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976); *Associated Industries of New York States, Inc. v. United States Department of Labor*, 487 F.2d 342, 349–350 (2nd Cir. 1973) (Friendly, J.); Scalia & Goodman, *Procedural Aspects of the Consumer Product Safety Act*, 20 U.C.L.A.L.Rev. 899, 934–35 & nn. 138–39 (1973).

own views. As described earlier,[56] Judge Pfeiffer determined that there were factors relating to § 810 that warranted recovering less than the entire amount of subsidies paid. While Judge Pfeiffer rejected AGAFBO's claims for mitigation due to such factors as reliance on advice of counsel or military pressure, he reviewed the nature and extent of each carrier's participation and reduced four out of five lines' payments accordingly.

The court might well have applied the mitigation factors to the subsidy recovery assessment differently than Judge Pfeiffer. The Hearing Examiner recommended that the recovery from Lykes be prorated to only that percentage represented by T.R. 21 and that the other four lines' shares be further prorated based on the percentage of military cargo they carried on T.R. 21. In so doing Judge Pfeiffer paired potential recoveries estimated to be over 134 million dollars[57] to something around ten million dollars. This is quite a severe mitigation. But keeping in mind the reviewing and therefore limited role of this court, the court cannot say such a balance of § 810 enforcement interests and maritime industry health would have lacked a justifiable basis in the record.[58]

■ Lest any subsequent seafarer should misinterpret the above, the court would like to make its view of § 810 unmistakably clear. Section 810 provides for the nonpayment, and hereafter one assumes the recovery, of all subsidies paid to offending lines. There is no basis in the statute for limiting that recovery to subsidies attributable to one route or another. Such a limitation undercuts the obvious intent of Congress to deny rogue lines who attempt to force competitors out of business the succor of any government subsidies from any

source. Thus, AGAFBO in the present case undoubtedly had the resources to compete unfairly with Sapphire because of subsidies paid to it not just on T.R. 21 but on all the trade routes. AGAFBO's argument that other provisions in the Merchant Marine Act call for prorating subsidies and thus the § 810 subsidy recovery should be automatically prorated via route and cargo[59] is wholly unpersuasive. If anything, the argument demonstrates why § 810 subsidy recoveries should not be prorated at all. Sections 506 and 605(a) of the Act allow, under certain conditions, subsidized lines to operate for a short period in domestic waters and thus compete with unsubsidized domestic lines. These provisions provide for a pro rata reduction of the subsidy to such lines based on a comparison of the revenue derived from the domestic trade with revenue derived from foreign trade. *See* 46 U.S.C. §§ 1156, 1175(a) (1976). But this pro rata reduction of subsidy is employed when subsidized lines simply compete, with the consent of the Secretary of Commerce and in a legal and proper manner, with unsubsidized lines plying the domestic trade. It hardly seems appropriate to apply the same formula when subsidized lines violate § 810 by engaging in a practice with other carriers which is unjustly discriminatory or unfair to another American shipping line. Nevertheless, under the remarkable and, one assumes, unique set of facts in this case, the court cannot say the Maritime Administration would have abused its discretion had it decided to prorate the subsidy recoveries as per Judge Pfeiffer's recommendation.

**B. *The Decision of the Maritime Subsidy Board***

■ The MSB's evaluation of the various mitigating factors do not differ radically

---

**56.** *See supra* at 927–928.

**57.** See the chart of cash subsidy payments made to selected shipping companies prepared by the Office of Finance, Maritime Administration, Department of Commerce, *reprinted in* vol. 2784, Records and Briefs, United States Court of Appeals, District of Columbia at A119 (supplemental appendix of Marshall P. Safir).

**58.** The court would not have sustained, however, the Chief Hearing Examiner's finding that the non-trade lines were innocent of even a technical violation of § 810.

**59.** Supplemental Brief of Intervening Defendant "Trade Lines" on Plaintiff's Motion for Summary Judgment at 16–17.

from those of the Hearing Examiner assessed above and the court will not review them in detail. As is undoubtedly clear from the court's earlier analysis of these factors, certain of the Board's findings are legally in error or otherwise unsupported by the record. Specifically, where the Board found AGAFBO's reliance on advice of counsel of "background" importance, the court holds that alleged reliance on such improbable advice is of no importance. In addition, contrary to the Board's findings, the court holds AGAFBO's concern over Waterman's resignation and the financial status of AGAFBO's associated van lines does not constitute a mitigating factor.

After assessing the mitigating factors the MSB went on to interpret the provision in § 810 governing the kinds of subsidy to be withheld (or in this case, recovered). In the Board's view, when Congress stated in § 810 that "[n]o payment or subsidy of any kind shall be paid directly or indirectly out of funds of the United States or any agency of the United States to any contractor or charterer who shall violate this subsection" Congress "did not intend recovery in excess of ODS payments." [60] The Board based its assessment on the first sentence in § 810, which limits the statute's applicability to contractors receiving operating-differential subsidies (ODS) payments under subchapter VI of the Act and charterers under subchapter VII. Such a limitation, according to the Board, reflected "careful drafting" by Congress to exclude operators receiving construction-differential subsidies (CDS), who Congress "conspicuously failed to mention" in § 810, or those receiving premium payments on P.L. 480 preference cargoes.[61] The Board's logic is manifest: contractors who receive CDS only or P.L. 480 payments only are not covered by § 810, even if they engage in predatory acts as blatant as those committed by AGAFBO in this case. Thus, to construe § 810 to force recovery from ODS operators of CDS and P.L. 480 is irra-

tional, unjust and contrary to the will of Congress.

The court sympathizes with the Board's attempt at rationalizing the scope of § 810, but it cannot concur with the Board's reading of Congressional intent. From the structure and content of the Merchant Marine Act of 1936 it appears that Congress intended that the construction subsidies would serve to enhance and support our nation's shipbuilding industry. Presumably, construction subsidies aid shipyards who cannot compete economically with foreign yards. The ship owners, who one assumes could always buy their ships abroad at the same low price made possible by the subsidies, are aided by operating subsidies and not construction subsidies. When Congress limited the scope of § 810 to those contractors receiving ODS under subchapter VI and those charterers operating under subchapter VII, it presumably omitted any mention of subchapter V CDS recipients because it assumed that they were not the individuals discussed at hearings on the 1936 Act that were running "fighting ships" and driving competitors out of business with the aid of the nation's treasury. Congress made no mention of P.L. 480 recipients because P.L. 480 was not passed until July 10, 1954.

The Board's attempt at rationalizing the Act by limiting § 810 recoveries to ODS does no such thing. Shippers who receive only P.L. 480 preference payments and who violate the Act would remain out of reach. The court believes that Congress intended § 810 to discourage any subsidized shipper from operating unfairly to hurt its competitors. Congress limited § 810 to shippers receiving subsidies under subchapters VI and VII because it felt those were the only group of citizens subsidized by the government who were in the business of foreign maritime trade. Congress then directed that "*no* payment or subsidy of *any* kind shall be paid *directly* or *indirectly*" to such shippers.[62] If Congress had intended

---

**60.** Opinion and Order at 60, 3 MSBMADCR 166, A.R. at 6310.

**61.** Opinion and Order at 59, 3 MSBMADCR 166, A.R. at 6309.

**62.** 46 U.S.C. § 1227 (emphasis added).

to limit subsidy withholding (or recovery) to ODS it is difficult to understand why they used such categorical language and even more difficult to understand why they would use the words "paid directly or indirectly." If there are shipping lines that receive only CDS or P.L. 480, that violate § 810 and that escape the reach of § 810 because they do not receive ODS or do not charter ships under subchapter VII of the Act, Congress must surely turn its attention to the "unfair" and "discriminatory" nature of this statute. But so far this is just rank speculation, proffered by the intervenors and adopted by the Maritime Subsidy Board. The way to rationalize the statute, if rationalizing it needs, is not to gut its application to the shippers it clearly governs.

Even if the court accepted the Board's explanation regarding CDS and subchapters VI and VII, that would not explain why § 704 payments should not be recovered as per Judge Pfeiffer's recommendation. Section 704 is obviously part of chapter VII, not chapter V and thus is included under § 810 under even the Board's construction of that statute.

In this court's view Congress meant exactly what it said in § 810: "[n]o subsidy or payment of any kind shall be paid . . . ." The court readily accepts the intervenor's position that § 810 operates as a penal provision and should thus be strictly construed. But once the Second Circuit concluded that § 810 requires recovery and not just withholding of subsidies, the court sees no need to "construe" the statute. As the Supreme Court noted about a different statute three-quarters of a century ago: "It requires an exercise of ingenuity to establish uncertainty in these provisions." *McCune v. Essig*, 199 U.S. 382, 389, 26 S.Ct. 78, 80, 50 L.Ed. 237 (1905).

 Apart from the court's conclusion that the Board erred in giving some allowance to several of the mitigation fac-

tors proffered by AGAFBO and in limiting the subsidy recoveries to ODS payments, the court believes the Board generally abused its discretion by reducing the ten million dollar subsidy recovery recommended by the Hearing Examiner to something under three million dollars. By AGAFBO's own accounting its member lines sacrificed fourteen million dollars in their unfair competition with Sapphire.[63] If the subsidy recovery is pegged at a comparatively insubstantial level, the maritime industry will regard it not as a deterrent but as an acceptable cost of doing business their way. The Public Counsel, who was a party to the Sapphire litigation during both the lengthy hearings before Judge Pfeiffer and the appeal before the MSB, is of the opinion that Judge Pfeiffer's recommended subsidy recovery "is the rock-bottom minimum" to provide effective deterrence to violations of § 810.[64] The court concurs in this view and holds that the MSB's further reduction of subsidy recoveries to a level less than one-third of that recommended by Judge Pfeiffer was an abuse of the Board's discretion.

 The non-trade lines, those AGAFBO members who were not operating on T.R. 21, were not direct competitors of Sapphire, and did not vote on the price reductions, were held by the Board to be technical violators of § 810. The Board suspended any subsidy recovery from these lines. The court agrees with the Board that these lines violated § 810. Although the non-trade lines were not competing with Sapphire in 1964 and 1965, they were clearly concerned lest Sapphire prosper and expand into their trade routes. There is some evidence in the record that some of the non-trade lines actively supported the price reductions and all of the lines continued to conform to the AGAFBO conference agreement after the predatory prices were posted. Despite this, the court cannot say the Board abused its discretion in remitting all

---

63. *See* Complaint for Review of Agency Action and for Declaratory Judgment and Injunctive Relief at 5 (Civil Action No. 74–1788, December 6, 1974).

64. Public Counsel's July 31, 1972 Reply to Exceptions at 8, A.R. 6100.

subsidy recovery from these lines. In the unique setting of this case, imposing subsidy recoveries on shipping lines who were not competing with Sapphire and who did not profit immediately from Sapphire's demise may well violate the dual Congressional purpose of regulating the maritime industry while fostering its growth.[65]

C. *The Order of the Secretary of Commerce*

■ The Secretary's order reducing the subsidy recovery to slightly over a million dollars is a complete mystery. Since that order is obviously premised to a major degree on the Board's analysis,[66] it suffers all the flaws of the Board's own conclusions. Added to these infirmities is the Secretary's conclusion that but for the "active inducement" of federal officials, AGAFBO would never have posted its unfair and discriminatory rate reductions. After the appeal of this case in 1977 Judge Wright wrote that "the conclusion is virtually compelled that the Secretary has simply failed to come to grips with the difficulties in the evidence in the record." 551 F.2d at 455. The court believes that the Secretary's order is so far afield as to be beyond mere clarification.

VII. *Mr. Safir's Motion for a Preliminary Injunction or a Temporary Restraining Order*

On February 27, 1981 Mr. Safir filed a Motion for Preliminary Injunction Pendente Lite or a Temporary Restraining Order seeking to prohibit certain actions by the Secretary of Commerce and United States Lines relating to 1981 shipping activity. Although the relief sought by Mr. Safir is not entirely clear, it appears that he seeks to enjoin United States Lines from altering its "financial structure" to assure the ship-

ping line's continued capacity to repay the subsidy payments that are the subject of this suit.

In this jurisdiction there is a four-part test for determining whether a preliminary injunction should issue: "(1) Has the petitioner made a strong showing that it is likely to prevail on the merits of its appeal? . . . (2) Has the petitioner shown that without such relief, it will be irreparably injured? . . . (3) Would the issuance of a stay substantially harm other parties interested in the proceedings? . . . (4) Where lies the public interest?" *Virginia Petroleum Jobbers Association v. FPC*, 259 F.2d 921, 925 (D.C.Cir.1958), *quoted in National Ass'n of Farmworkers v. Marshall*, 628 F.2d 604, 613 (D.C.Cir.1980). The court does not believe Mr. Safir has come close to meeting this heavy burden.

■ Unlike the *Holiday Tours* case,[67] Mr. Safir has an unusually strong argument on the first factor. The court is today ruling in Mr. Safir's favor and reversing the Secretary of Commerce's order. The Secretary initially ordered United States Lines to repay $487,292.14 in subsidies. Presumably, on remand the Secretary will have to assess a larger subsidy recovery against United States Lines. But as should be clear from this memorandum, the Secretary's duty in this regard does not encompass imposing the gargantuan recovery envisioned by Mr. Safir. Thus, although Mr. Safir has prevailed on the merits, it remains to be seen how great will be United States Lines' new obligation.

Mr. Safir's petition utterly fails on the remaining three factors. There has been no showing that Mr. Safir himself will be harmed by denying relief. If one assumes that harm to the United States and not Mr.

---

**65.** On October 29, 1979 the court granted Mr. Safir's request to supplement the record in an *Overton*-type hearing. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 420, 91 S.Ct. 814, 825, 28 L.Ed.2d 136 (1970). Mr. Safir's efforts in this regard lacked a certain coherence. Since the court has resolved the case in Mr. Safir's favor, however, there would appear to be no need to request further evidence via an *Overton*-type hearing.

**66.** For example, without any analysis or explanation the Secretary followed the Board's lead in ordering the recovery of only operating-differential subsidies.

**67.** *Washington Metropolitan Area Transit Commission v. Holiday Tours*, 559 F.2d 841 (D.C.Cir.1977).

Safir would suffice, there has still been no showing that United States Lines will be unable to pay its future subsidy recovery obligation, absent a preliminary injunction. United States Lines has averred that a grant of Mr. Safir's vaguely worded plea to freeze the shipping line's "financial structure" would impose on it grave hardship, and this court can readily appreciate the likelihood of such a result. Finally, the public interest seems to lie, on this narrowest of planes, very much with the United States Lines. However valid Mr. Safir's suit may be, and the court has found it very valid indeed today, he may not use it to indiscriminately flail his opponents. This would not assist Mr. Safir and would only harm the maritime industry and the thousands of Americans dependent on the industry's operations. It is therefore

ORDERED that Mr. Safir's Motion for Preliminary Injunction Pendente Lite or a Temporary Restraining Order is denied; and it is

FURTHER ORDERED that the plaintiff's motion for summary judgment in C.A. 74–1474 is granted and the Secretary of Commerce's Order of September 9, 1974 is reversed and the case remanded to the Secretary of Commerce; and it is

FURTHER ORDERED that C.A. Nos. 74–1788 and 75–0077 are dismissed.

### ORDER

It is hereby ORDERED that the memorandum opinion issued in this case on October 27, 1981 is hereby vacated and the memorandum signed this day is issued in its place.